### CHEROKEE NATION *v.* STATE OF GEORGIA.

#### *Status of Indian nations.*

Motion for an injunction to prevent the execution of certain acts of the legislature of the state of Georgia, in the territory of the Cherokee nation of Indians, on behalf of the Cherokee nation; they claiming to proceed in the supreme court of the United States, as a foreign state, against the state of Georgia, under the provision of the constitution of the United States which gives to the court jurisdiction in controversies in which a state of the United States or the citizens thereof, and a foreign state, citizens or subjects thereof, are parties.

The Cherokee nation is not a foreign state, in the sense in which the term "foreign state" is used in the constitution of the United States.

The third article of the constitution of the United States describes the extent of the judicial power; the second section closes an enumeration of the cases to which it extends, with "controversies between a state or the citizens thereof, and foreign states, citizens or subjects;" a subsequent clause of the same section gives the supreme court original jurisdiction in all cases in which a state shall be a party—the state of Georgia may then certainly be sued in this court.

The Cherokees are a state; they have been uniformly treated as a state, since the settlement of our country; the numerous treaties made with them by the United States recognise them as a people capable of maintaining the relations of peace and war; of being responsible in their political character for any violation of their engagements, or for any aggression committed on the citizens of the United States by any individual of their community; laws have *been enacted in the spirit of these treaties; the acts of our government plainly recognise the [ *2 Cherokee nation as a state; and the courts are bound by those acts.

The condition of the Indians, in relation to the United States, is perhaps unlike that of any other two peoples in existence. In general, nations not owing a common allegiance are foreign to each other; the term foreign nation is with strict propriety applicable by either to the other; but the relation of the Indians to the United States is marked by peculiar and cardinal distinctions which exist nowhere else.

The Indians are acknowledged to have an unquestionable, and heretofore, an unquestioned, right to the lands they occupy, until that right shall be extinguished by a voluntary cession to our government. It may well be doubted, whether those tribes which reside within the acknowledged boundaries of the United States can, with strict accuracy, be denominated foreign nations; they may more correctly, perhaps, be denominated domestic dependent nations. They occupy a territory to which we assert a title, independent of their will, which must take effect, in point of possession, when their right of possession ceases—meanwhile, they are in a state of pupilage; their relations to the United States resemble that of a ward to his guardian;

they look to our government for protection; rely upon its kindness and its power; appeal to it for relief to their wants; and address the president as their great father.[1]

The bill filed on behalf of the Cherokees seeks to restrain a state from the forcible exercise of legislative power over a neighboring people asserting their independence; their right to which the state denies. On several of the matters alleged in the bill, for example, on the laws making it criminal to exercise the usual power of self-government in their own country, by the Cherokee nation, this court cannot interpose, at least, in the form in which those matters are presented; that part of the bill which respects the land occupied by the Indians, and prays the aid of the court to protect their possessions, may be more doubtful; the mere question of right might, perhaps, be decided by this court, in a proper case, with proper parties. But the court is asked to do more than decide on the title; the bill requires us to control the legislature of Georgia, and to restrain the exertion of its physical force; the propriety of such an interposition by the court may well be questioned; it savors too much of the exercise of political power, to be within the proper province of the judicial department.

MOTION for Injunction. This case came before the court on a motion, on behalf of the Cherokee nation of Indians, for a *subpœna*, and for an injunction, to restrain the state of Georgia, the governor, attorney-general, judges, justices of the peace, sheriffs, deputy-sheriffs, constables, and others the officers, agents and servants of that state, from executing and enforcing the laws of Georgia, or any of these laws, or serving process, or doing anything towards the execution or enforcement of those laws, within the Cherokee territory, as designated by treaty between the United States and the Cherokee nation.

*3 ]   The motion was made, after notice, and a copy of the bill *filed at the instance and under the authority of the Cherokee nation, had been served on the governor and attorney-general of the state of Georgia, on the 27th December 1830, and the 1st of January 1831. The notice stated that the motion would be made in this court on Saturday, the 5th day of March 1831. The bill was signed by John Ross, principal chief of the Cherokee nation, and an affidavit, in the usual form, of the facts stated in the bill, was annexed; which was sworn to before a justice of the peace of Richmond county, state of Georgia.

The bill set forth the complainants to be "the Cherokee nation of Indians, a foreign state, not owing allegiance to the United States, nor to

---

[1] The Indian tribes are distinct, independent political communities, retaining the right of self-government, subject to the protecting power of the United States Worcester *v.* Georgia, 6 Pet. 515. They are not regarded as the owners of the territories which they respectively occupy; it is considered as vacant and unoccupied land belonging to the United States. United States *v.* Rogers, 4 How. 567. But their hunting-grounds are as much in their actual possession, as the cleared fields of the whites; and their right to its exclusive enjoyment, in their own way, and for their own purposes, is as much respected, until they abandon them, make a cession to the government, or an authorized sale to individuals. Mitchell *v.* United States, 9 Pet. 746. Subject to this right of possession, the ultimate fee is in the government; they cannot cut timber merely for purpose of sale; though if the cutting of timber be merely incidental to the improvement of their land, they may dispose of it at their pleasure. United States *v.* Cook, 19 Wall. 591. A grant of alternate sections of land for railroad purposes, only operates on public land owned absolutely by the United States; not to such as is set apart for the use of an Indian tribe, under a treaty. Railroad Co. *v.* United States, 92 U. S. 733. The Pueblo Indians of New Mexico, however, occupy a different position; by the Plan of Iguala, they became citizens of Mexico, and by the treaty of Guadalupe-Hidalgo, citizens of the United States, and of right entitled to all the privileges of citizens. United States *v.* Lucero, 1 New Mexico 422. The removal of an Indian tribe can only be made by the authority and under the care of the general government. Fellows *v.* Blacksmith, 19 How. 366; s. c. 7 N. Y. 401.

Cherokee Nation v. Georgia.

any state of this Union, nor to any prince, potentate or state, other than their own." " That from time immemorial, the Cherokee nation have composed a sovereign and independent state, and in this character have been repeatedly recognised, and still stand recognised, by the United States, in the various treaties subsisting between their nation and the United States." That the Cherokees were the occupants and owners of the territory in which they now reside, before the first approach of the white men of Europe to the western continent; " deriving their title from the Great Spirit, who is the common father of the human family, and to whom the whole earth belongs." Composing the Cherokee nation, they and their ancestors have been and are the sole and exclusive masters of this territory, governed by their own laws, usages and customs.

The bill stated the grant, by a charter, in 1732, of the country on this continent, lying between the Savannah and Alatahama rivers, by George the Second, " monarch of several islands on the eastern coast of the Atlantic," the same country being then in the ownership of several distinct, sovereign and independent nations of Indians, and amongst them the Cherokee nation. The foundation of this charter, the bill stated, was asserted to be the right of discovery to the territory granted; a ship manned by the subjects of the king having, " about two centuries and a half before, sailed along the coast of the western hemisphere, from the 56th to the 38th degree of north *latitude, and looked upon the face of that coast, without even landing on any part of it." This right, as affecting the right of the [ *4 Indian nation, the bill denied; and asserted, that the whole length to which the right of discovery was claimed to extend among European nations was, to give to the first discoverer the prior and exclusive right to purchase these lands from the Indian proprietors, against all other European sovereigns : to which principle the Indians had never assented; and which they denied to be a principle of the natural law of nations, or obligatory on them. The bill alleged, that it never was claimed, under the charter of George the Second, that the grantees had a right to disturb the self-government of the Indians who were in possession of the country; and that on the contrary, treaties were made by the first adventurers with the Indians, by which a part of the territory was acquired by them for a valuable consideration; and no pretension was ever made, to set up the British laws, in the country owned by the Indians. That various treaties had been, from time to time, made between the British colony in Georgia; between the state of Georgia, before her confederation with the other states; between the confederate states afterwards; and finally, between the United States under their present constitution, and the Cherokee nation, as well as other nations of Indians; in all of which, the Cherokee nation, and the other nations, had been recognised as sovereign and independent states; possessing both the exclusive right to their territory, and the exclusive right of self-government within that territory. That the various proceedings, from time to time, had by the congress of the United States under the articles of their confederation, as well as under the present constitution of the United States, in relation to the subject of the Indian nations, confirmed the same view of the subject.

The bill proceeded to refer to the treaty concluded at Hopewell, on the 28th November 1785, " between the commissioners of the United States and head-men and warriors of all the Cherokees ;" the treaty of Holston, of the

22d July 1791, " between the President of the United States, by his duly-authorized commissioner, William Blount, and the chiefs and warriors of the Cherokee nation of Indians," and the additional *article of 17th November 1792, made at Philadelphia, by Henry Knox, the secretary at war, acting on behalf of the United States ; the treaty made at Philadelphia, on the 26th June 1794 ; the treaties between the same parties, made at Tellico, 2d October 1790 ; on the 24th October 1804 ; on the 25th October 1805, and the 27th October 1805 ; the treaty at Washington, on the 7th January 1806, with the proclamation of that convention by the president, and the elucidation of that convention of 11th September 1807 ; the treaty between the United States and the Cherokee nation, made at the city of Washington, on the 22d day of March 1816 ; another convention, made at the same place, on the same day, by the same parties ; a treaty made at the Cherokee agency, on the 8th July 1807 ; and a treaty, made at the city of Washington, on the 27th February 1819 ; " all of which treaties and conventions were duly ratified and confirmed by the senate of the United States, and became thenceforth, and still are, a part of the supreme law of the land." By those treaties, the bill asserted, the Cherokee nation of Indians were acknowledged and treated with as sovereign and independent states, within the boundary arranged by those treaties ; and that the complainants were, within the boundary established by the treaty of 1719, sovereign and independent ; with the right of self-government, without any right of interference with the same on the part of any state of the United States. The bill called the attention of the court to the particular provisions of those treaties, " for the purpose of verifying the truth of the general principles deduced from them."

The bill alleged, from the earliest intercourse between the United States and the Cherokee nation, an ardent desire had been evinced by the United States to lead the Cherokees to a greater degree of civilization. This is shown by the 14th article of the treaty of Holston ; and by the course pursued by the United States in 1808, when a treaty was made, giving to a portion of the nation which preferred the hunter-state, a territory on the west of the Mississippi, in exchange for a part of the lower country of the Cherokees ; and assurances were given by the president, that those who chose to remain, for the purpose of engaging in the pursuits of agricultural and civilized life, in the country they occupied, might rely." on the *patronage, aid and good neighborhood of the United States." The treaty of 8th July 1817, was made to carry those promises into effect ; and in reliance on them, a large cession of lands was thereby made ; and in 1819, on the 27th February, another treaty was made, the preamble of which recites that a greater part of the Cherokee nation had expressed an earnest desire to remain on this side of the Mississippi, and were desirous to commence those measures which they deem necessary to the civilization and preservation of their nation ; to give effect to which object, without delay, that treaty was declared to be made ; and another large cession of their lands was thereby made by them to the United States. By a reference to the several treaties, it would be seen, that a fund was provided for the establishment of schools ; and the bill asserted, that great progress had been made by the Cherokees in civilization and in agriculture. They had established a constitution and form of government, the leading features of which

4

they had borrowed from that of the United States; dividing their government into three separate departments, legislative, executive and judicial. In conformity with this constitution, these departments had all been organized. They had formed a code of laws, civil and criminal, adapted to their situation; had erected courts to expound and apply those laws, and organized an executive to carry them into effect. They had established schools for the education of their children, and churches in which the Christian religion is taught; they had abandoned the hunter-state, and become agriculturists, mechanics and herdsmen; and under provocations long continued and hard to be borne, they had observed, with fidelity, all their engagements by treaty with the United States. Under the promised "patronage and good neighborhood" of the United States, a portion of the people of the nation had become civilized Christians and agriculturists; and the bill alleged, that in these respects they were willing to submit to a comparison with their white brethren around them.

The bill claimed for the Cherokee nation the benefit of the provision in the constitution, that treaties are the supreme law of the land, and all judges are bound thereby; of the declaration in the constitution, that no state shall pass any law *impairing the obligation of contracts; and averred, that all the treaties referred to were contracts of the highest [ *7 character and of the most solemn obligation. It asserted, that the constitutional provision, that congress shall have power to regulate commerce with the Indian tribes, was a power which, from its nature, was exclusive; and consequently, forbade all interference by any one of the states. That congress had, in execution of this power, passed various acts, and among others the act of 1802, " to regulate trade and intercourse with the Indian tribes, and to preserve peace on the frontiers." The object of these acts was to consecrate the Indian boundary as arranged by the treaties; and they contained clear recognitions of the sovereignty of the Indians, and of their exclusive right to give and to execute the law within that boundary.

The bill proceeded to state, that, in violation of these treaties, of the constitution of the United States, and of the act of congress of 1802, the state of Georgia, at a session of her legislature held in December, in the year 1828, passed an act which received the assent of the governor of that state on the 20th day of that month and year, entitled, " an act to add the territory lying within this state, and occupied by the Cherokee Indians, to the counties of Carroll, De Kalb, Gwinett, Hall and Habersham, and to extend the laws of this state over the same, and for other purposes." That afterwards, to wit, in the year 1829, the legislature of the said state of Georgia passed another act, which received the assent of the governor on the 19th December of that year, entitled, " an act to add the territory lying within the chartered limits of Georgia, now in the occupancy of the Cherokee Indians, to the counties of Carroll, De Kalb, Gwinett, Hall and Habersham, and to extend the laws of this state over the same, and annul all laws and ordinances made by the Cherokee nation of Indians, and to provide for the compensation of officers serving legal processes in said territory, and to regulate the testimony of Indians, and to repeal the ninth section of the act of 1828 on this subject." The effect of these laws, and their purposes, was stated to be, to parcel out the territory of the Cherokees; to extend all the laws of Gerogia over the same; to abolish the Cherokee laws, and to deprive the Cherokees

of the protection of their laws; *to prevent them, as individuals, from enrolling for emigration, under the penalty of indictment before the state courts of Georgia ; to make it murder, in the officers of the Cherokee government, to inflict the sentence of death, in conformity with the Cherokee laws, subjecting them all to indictment therefor, and death by hanging ; extending the jurisdiction of the justices of the peace of Georgia into the Cherokee territory, and authorizing the calling out of the militia of Georgia to enforce the process ; and finally, declaring that no Indian, or decendant of any Indian, residing within the Cherokee nation of Indians, should be deemed a competent witness in any court of the state of Georgia, in which a white person might be a party, except such white person resided within the said nation. All these laws were averred to be null and void : because repugnant to treaties in full force ; to the constitution of the United States ; and to the act of congress of 1802.

The bill then proceeded to state the interference of President Washington for the protection of the Cherokees, and the resolutions of the senate, in consequence of his reference of the subject of intrusions on their territory. That in 1802, the state of Georgia, in ceding to the United States a large body of lands within her alleged chartered limits, and imposing a condition that the Indian title should be peaceably extinguished, admitted the subsisting Indian title. That cessions of territory had always been voluntarily made by the Indians, in their national character ; and that cessions had been made of as much land as could be spared, until the cession of 1819, " when they had reduced their territory into as small a compass as their own convenience would bear; and they then accordingly resolved to cede no more." The bill then referred to the various applications of Georgia to the United States, to extinguish the Indian title by force, and her denial of the obligations of the treaties with the Cherokees ; although, under these treaties, large additions to her disposable lands had been made ; and stated, that Presidents Monroe and Adams, in succession, understanding the articles of cession and agreement between the state of Georgia and the United States in the year 1802, as binding the United States to extinguish the Indian title, so soon only as it could be done peaceably and on reasonable terms, refused, themselves, to apply force to these *complainants, or to permit it to

*9 ]  be applied by the state of Georgia, to drive them from their possession ; but, on the contrary, avowed their determination to protect these complainants by force, if necessary, and to fulfil the guarantee given to them by the treaties. The state of Georgia, not having succeeded in these applications to the government of the United States, had resorted to legislation, intending to force, by those means, the Indians from their territory. Unwilling to resist, by force of arms, these pretensions and efforts, the bill stated, that application for protection, and for the execution of the guarantee of the treaties, had been made by the Cherokees to the present president of the United States, and they had received for answer, " that the president of the United States has no power to protect them against the laws of Georgia."

The bill proceeds to refer to the act of congress of 1830, entitled " an act to provide for an exchange of lands with the Indians residing in any of the states or territories, and for their removal west of the Mississippi." The act is to apply to such of the Indians as may choose to remove, and by

6

the proviso to it, nothing contained in the act shall be construed as authorizing or directing the violation of any existing treaty between the United States and any of the Indian tribes. The complainants had not chosen to remove, and this, it was alleged, it was sufficient for the complainants to say: but they proceeded to state, that they were fully satisfied with the country they possessed; the climate was salubrious; it was convenient for commerce and intercourse; it contained schools, in which they could obtain teachers from the neighboring states, and places for the worship of God, where Christianity is taught by missionaries and pastors easily supplied from the United States. The country, too, "is consecrated in their affections, from having been immemorially the property and residence of their ancestors, and from containing now the graves of their fathers, relatives and friends." Little was known of the country west of the Mississippi; and if accepted, the bill asserted, it would be the grave not only of their civilization and Christianity, but of the nation itself.

It also alleged, that the portion of the nation who emigrated *under the patronage and sanction of the president, in 1808 and [*10 1809, and settled on the territory assigned to them on the Arkansas river, were afterwards required to remove again; and that they did so, under the stipulations of a treaty made in May 1828. The place, to which they removed under this last treaty, was said to be exposed to incursions of hostile Indians, and that they were "engaged in constant scenes of killing and scalping, and have to wage a war of exermination with more powerful tribes, before whom they will ultimately fall." They had, therefore, decidedly rejected the offer of exchange. The bill then proceeded to state various acts, under the authority of the laws of Georgia, in defiance of the treaties referred to, and of the constitution of the United States, as expressed in the act of 1802; and that the state of Georgia had declared its determination to continue to enforce these laws, so long as the complainants should continue to occupy their territory. But while these laws were enforced in a manner the most harassing and vexatious to the complainants, the design seemed to have been deliberately formed, to carry no one of these cases to final decision in the state courts; with the view, as the complainants believed, and therefore alleged, to prevent any one of the Cherokee defendants from carrying these cases to the supreme court of the United States, by writ of error, for review, under the 25th section of the act of congress of the United States, passed in the year 1789, and entitled "an act to establish the judicial courts of the United States."

Numerous instances of proceedings were set forth at large in the bill. The complainants expected protection from these unconstitutional acts of Georgia, by the troops of the United States; but notice had been given by the commanding officer of those troops to John Ross, the principal chief of the Cherokee nation, that "these troops, so far from protecting the Cherokees, would co-operate with the civil officers of Georgia, in enforcing their laws upon them." Under these circumstances, it was said, that it could not but be seen, that unless this court should interfere, the complainants had but these alternatives; either to surrender their lands in exchange for others in the western wilds of this continent, which would be to seal, at once, the doom of their civilization, Christianity and *national existence; or to [*11 surrender their national sovereignty, their property, rights and liber-

ties, guarantied as these now are by so many treaties, to the rapacity and injustice of the state of Georgia ; or to arm themselves in defence of these sacred rights, and fall, sword in hand, on the graves of their fathers.

These proceedings, it was alleged, were wholly inconsistent with equity and good conscience, tended to the manifest wrong of the complainants, and violated the faith of the treaties to which Georgia and the United States were parties, and of the constitution of the United States. These wrongs were of a character wholly irremediable by the common law ; and the complainants were wholly without remedy of any kind, except by the interposition of the court. The bill averred, that this court had, by the constitution and laws of the United States, original jurisdiction of controversies between a state and a foreign state, without any restriction as to the nature of the controversy ; that by the constitution, treaties were the supreme law of the land. That as a foreign state, the complainants claimed the exercise of the powers of the court to protect them in their rights, and that the laws of Georgia, which interfered with their rights and property, should be declared void, and their execution be perpetually enjoined.

The bill stated, that John Ross was "the principal chief and executive head of the Cherokee nation ;" and that, in a full and regular council of that nation, he had been duly authorized to institute this and all other suits which might become necessary for the assertion of the rights of the entire nation. The bill then proceeded, in the usual form, to ask an answer to the allegations contained in it, and "that the said state of Georgia, her governor, attorney-general, judges, magistrates, sheriffs, deputy-sheriffs, constables, and all other her officers, agents and servants, civil and military, might be enjoined and prohibited from executing the laws of that state, within the boundary of the Cherokee territory, as prescribed by the treaties now subsisting between the United States and the Cherokee nation, or interfering in any manner with the rights of self-government possessed by the Cherokee nation, within the limits of their territory, as defined by the treaty ; that the two laws of Georgia before mentioned as having been passed in the years *1828 and 1829 might, by the decree of the court, be declared unconstitutional and void ; and that the state of Georgia, and all her officers, agents and servants might be for ever enjoined from interfering with the lands, mines and other property, real and personal, of the Cherokee nation, or with the persons of the Cherokee people, for, or on account of anything done by them within the limits of the Cherokee territory ; that the pretended right of the state of Georgia to the possession, government or control of the lands, mines and other property of the Cherokee nation, within their territory, might be declared to be unfounded and void, and that the Cherokees might be left in the undisturbed possession, use and enjoyment of the same, according to their own sovereign right and pleasure, and their own laws, usages and customs, free from any hindrance, molestation or interruption by the state of Georgia, her officers, agents and servants ; that the complainants might be quieted in the possession of all their rights, privileges and immunities, under their various treaties with the United States ; and that they might have such other and further relief as the court might deem consistent with equity and good conscience, and as the nature of their case might require."

On the day appointed for the hearing, the counsel for the complainants

8

filed a supplemental bill, sworn to by Richard Taylor, John Ridge and W. S. Coodey, of the Cherokee nation of Indians, before a justice of the peace of the county of Washington, in the district of Columbia.

The supplemental bill stated, that since their bill, now submitted, was drawn, the following acts, demonstrative of the determination of the state of Georgia to enforce her assumed authority over the complainants and their territory, property, and jurisdiction, had taken place. The individual called in that bill Corn Tassel, and mentioned as having been arrested in the Cherokee territory, under process issued under the laws of Georgia, had been actually hung ; in defiance of a writ of error allowed by the chief justice of this court to the final sentence of the court of Georgia in his case. That writ of error having been received by the governor of the state was, as the complainants were informed and believed, immediately communicated by him to the legislature of the *state, then in session ; who promptly resolved, in substance, that the supreme court of the United States [*13 had no jurisdiction over the subject, and advised the immediate execution of the prisoner, under the sentence of the state court; which accordingly took place.

The complainants begged leave further to state, that the legislature of the state of Georgia, at the same session, passed the following laws, which had received the sanction of the governor of the state.

"An act to authorize the survey and disposition of lands within the limits of Georgia, in the occupancy of the Cherokee tribe of Indians, and all other unlocated lands within the limits of the said state, claimed as Creek land ; and to authorize the governor to call out the military force to protect surveyors in the discharge of their duties ; and to provide for the punishment of persons who may prevent, or attempt to prevent, any surveyor from performing his duties, as pointed out by this act, or who shall willfully cut down or deface any marked trees, or remove any land-marks which may be made in pursuance of this act ; and to protect the Indians in the peaceable possession of their improvements, and of the lots on which the same may be situate." Under this law it was stated, that the lands within the boundary of the Cherokee territory were to be surveyed, and to be distributed by lottery among the people of Georgia.

At the same session, the legislature of Georgia passed another act, entitled, " an act to declare void all contracts hereafter made with the Cherokee Indians, so far as the Indians are concerned ;" which act received the assent of the governor of the state on the 23d December 1830. The legislature of Georgia, at its same session, passed another law, entitled, " an act to provide for the temporary disposal of the improvements and possessions purchased from certain Cherokee Indians and residents ;" which act received the assent of the governor of the state, the 22d December 1830. At its same session, the legislature of Georgia passed another law, entitled, " an act to prevent the exercise of assumed and arbitrary power by all persons, under pretext of authority from the Cherokee Indians and their laws, and to prevent white persons from residing within that part of the chartered *limits of Georgia, occupied by the Cherokee Indians, and to provide a guard for the protection of the gold mines, and to enforce the laws [*14 of the state within the aforesaid territory." At the same session of its legislature, the state of Georgia passed another act, entitled " an act to author-

Cherokee Nation v. Georgia.

ize the governor to take possession of the gold, silver and other mines, lying and being in that section of the chartered limits of Georgia, commonly called the Cherokee country, and those upon all other unappropriated lands of the state, and for punishing any person or persons who may hereafter be found trespassing upon the mines."

The supplemental bill further stated the proceedings of the governor of Georgia, under these laws ; and that he had stationed an armed force of the citizens of Georgia, at the gold mines within the territory of the complainants, who were engaged in enforcing the laws of Georgia. Additional acts of violence and injustice were said to have been done under the authority of the laws of Georgia, and by her officers and agents, within the Cherokee territory.

The complainants alleged, that the several legislative acts, therein set forth and referred to, were in direct violation of the treaties enumerated in their bill, to which this was a supplement, as well as in direct violation of the constitution of the United States, and the act of congress passed under its authority, in the year 1802, entitled, " an act to regulate trade and intercourse with the Indian tribes, and to preserve peace on the frontiers." They prayed, that this supplement might be taken and received as a part of their bill ; that the several laws of Georgia therein set forth might be declared by the decree of this court to be null and void, on the ground of the repugnancy to the constitution, laws and treaties set forth above, and in the bill to which this was a supplement ; and that these complainants might have the same relief by injunction, and a decree of peace, or otherwise, according to equity and good conscience, against these laws, as against those which were the subject of their bill as first drawn.

The case was argued by *Sergeant* and *Wirt*, on the part of the complainants. No counsel appeared for the state of Georgia.

*15]    *For the complainants it was contended :  1. That the parties before the court were such as, under the constitution, to give to this court original jurisdiction of the complaint made by the one against the other.  2. That such a case or controversy, of a judicial nature, was presented by the bill, as to warrant and require the interposition of the authority of the court.  3. That the facts stated by the complainants exhibited such a case in equity, as to entitle them to the specific remedy by the injunction prayed for in the bill.

MARSHALL, Ch. J., delivered the opinion of the court.—This bill is brought by the Cherokee nation, praying an injunction to restrain the state of Georgia from the execution of certain laws of that state, which, as is alleged, go directly to annihilate the Cherokee as a political society, and to seize for the use of Georgia, the lands of the nation which have been assured to them by the United States, in solemn treaties repeatedly made and still in force.

If courts were permitted to indulge their sympathies, a case better calculated to excite them can scarcely be imagined. A people, once numerous, powerful, and truly independent, found by our ancestors in the quiet and uncontrolled possession of an ample domain, gradually sinking beneath our superior policy, our arts and our arms, have yielded their lands, by successive treaties, each of which contains a solemn guarantee of the residue, until

they retain no more of their formerly extensive territory than is deemed necessary to their comfortable subsistence.  To preserve this remnant, the present application is made.

Before we can look into the merits of the case, a preliminary inqury presents itself.   Has this court jurisdiction of the cause ?   The third article of the constitution describes the extent of the judicial power.   The second section closes an enumeration of the cases to which it is  extended, with " controversies " " between a state or citizens thereof, and foreign states, citizens or subjects."   A subsequent clause of the same section gives the supreme court original jurisdiction, in all *cases in which a state shall be a party.  The party defendant may then unquestionably be sued in this court.   May the plaintiff sue in it ?   Is the Cherokee nation a foreign state, in the sense in which that term is used in the constitution ?   The counsel for the plaintiffs have maintained the affirmative of this proposition with great earnestness and ability.   So much of the argument as was intended to prove the character of the Cherokees as a state, as a distinct political society, separated from others, capable of managing its own affairs and governing itself, has, in the opinion of a majority of the judges, been completely successful.   They have been uniformly treated as a state, from the settlement of our country.   The numerous treaties made with them by the United States, recognise them as a people capable of maintaining the relations of peace and war, of being responsible in their political character for any violation of their engagements, or for any aggression committed on the citizens of the United States, by any individual of their community. Laws have been enacted in the spirit of these treaties.   The acts of our government plainly recognise the Cherokee nation as a state, and the courts are bound by those acts.   [*16

A question of much more difficulty remains. · Do the Cherokees constitute a *foreign* state in the sense of the constitution?   The counsel have shown conclusively, that they are not a state of the Union, and  have insisted that, individually, they are aliens, not owing allegiance to the United States. An aggregate of aliens composing a state must, they say, be a foreign state ; each individual being foreign, the whole must be foreign.

This argument is imposing, but we must examine it more closely, before we yield to it.   The condition of the Indians in relation to the United States is, perhaps, unlike that of any other two people in existence.   In general, nations not owing a common allegiance, are foreign to each other.   The term *foreign* nation is, with strict propriety, applicable by either to the other. But the relation of the Indians to the United States is marked by peculiar and cardinal distinctions which exist nowhere else.   *The Indian territory is admitted to compose a part of the United States.   In all our maps, geographical treatises, histories and laws, it is so considered.   In all our intercourse with foreign nations, in our commercial regulations, in any attempt at intercourse between Indians and foreign nations, they are considered as within the jurisdictional limits of the United States, subject to many of those restraints which are imposed upon our own citizens.   They acknowledge themselves, in their treaties, to be under the protection of the United States ; they admit, that the United States shall have the sole and exclusive right of regulating the trade with them, and managing all their affairs as they think proper ; and the Cherokees in particular were allowed   [*17

by the treaty of Hopewell, which preceded the constitution, "to send a deputy of their choice, whenever they think fit, to congress." Treaties were made with some tribes, by the state of New York, under a then unsettled construction of the confederation, by which they ceded all their lands to that state, taking back a limited grant to themselves, in which they admit their dependence. Though the Indians are acknowledged to have an unquestionable, and heretofore unquestioned, right to the lands they occupy, until that right shall be extinguished by a voluntary cession to our government; yet it may well be doubted, whether those tribes which reside within the acknowledged boundaries of the United States can, with strict accuracy, be denominated foreign nations. They may, more correctly, perhaps, be denominated domestic dependent nations. They occupy a territory to which we assert a title independent of their will, which must take effect in point of possession, when their right of possession ceases. Meanwhile, they are in a state of pupilage; their relation to the United States resembles that of a ward to his guardian. They look to our government for protection; rely upon its kindness and its power; appeal to it for relief to their wants; and address the president as their great father. They and their country are considered by foreign nations, as well as by ourselves, as being so completely under the sovereignty and dominion of the United States, that any attempt to acquire their lands, or to form a political connection with them, would *be considered by all as an invasion of our territory and an act of hostility. These considerations go far to support the opinion, that the framers of our constitution had not the Indian tribes in view, when they opened the courts of the Union to controversies between a state or the citizens thereof and foreign states.

*18]

In considering this subject, the habits and usages of the Indians, in their intercourse with their white neighbors, ought not to be entirely disregarded. At the time the constitution was framed, the idea of appealing to an American court of justice for an assertion of right or a redress of wrong, had perhaps never entered the mind of an Indian or of his tribe. Their appeal was to the tomahawk, or to the government. This was well understood by the statesmen who framed the constitution of the United States, and might furnish some reason for omitting to enumerate them among the parties who might sue in the courts of the Union. Be this as it may, the peculiar relations between the United States and the Indians occupying our territory are such, that we should feel much difficulty in considering them as designated by the term foreign state, were there no other part of the constitution which might shed light on the meaning of these words. But we think that in construing them, considerable aid is furnished by that clause in the eighth section of the third article, which empowers congress to "regulate commerce with foreign nations, and among the several states, and with the Indian tribes." In this clause, they are as clearly contradistinguished, by a name appropriate to themselves, from foreign nations, as from the several states composing the Union. They are designated by a distinct appellation; and as this appellation can be applied to neither of the others, neither can the application distinguishing either of the others be, in fair construction, applied to them. The objects to which the power of regulating commerce might be directed, are divided into three distinct classes—foreign nations, the several states, and Indian tribes. When forming this article, the conven-

tion considered them as entirely distinct.  We cannot assume that the dis-
tinction was lost, in framing a subsequent article, unless there be something
in its language to authorize the assumption.

The counsel for the plaintiffs contend, that the words *" Indian
tribes" were introduced into the article, empowering congress to reg- [*19
ulate commerce, for the purpose of removing those doubts in which the
management of Indian affairs was involved by the language of the ninth arti-
cle of the confederation.   Intending to give the whole power of managing
those affairs to the government about to be instituted, the convention con-
ferred it explicitly ; and omitted those qualifications which embarrassed the
exercise of it, as granted in the confederation.  This may be admitted, with-
out weakening the construction which has been intimated.   Had the Indian
tribes been foreign nations, in the view of the convention, this exclusive
power of regulating intercourse with them might have been, and, most prob-
ably, would have been, specifically given, in language indicating that idea,
not in language contradistinguishing them from foreign nations.   Congress
might have been empowered " to regulate commerce with foreign nations,
including the Indian tribes, and among the several states." · This language
would have suggested itself to statesmen who considered the Indian tribes
as foreign nations, and were yet desirous of mentioning them particularly.

It has been also said, that the same words have not necessarily the same
meaning attached to them, when found in different parts of the same instru-
ment ; their meaning is controlled by the context.  This is undoubtedly
true.   In common language, the same word has various meanings, and the
peculiar sense in which it is used in any sentence, is to be determined by
the context.  This may not be equally true with respect to proper names.
" Foreign nations" is a general term, the application of which to Indian tribes,
when used in the American constitution, is, at best, extremely questionable.
In one article, in which a power is given to be exercised in regard to foreign
nations generally, and to the Indian tribes particularly, they are mentioned
as separate, in terms clearly contradistinguishing them from each other.
We perceive plainly, that the constitution, in this article, does not compre-
hend Indian tribes in the general term "foreign nations ;" not, we presume,
because a tribe may not be a nation, but because it is not foreign to the
United States.   When, afterwards, the term " foreign state " is introduced,
we cannot impute to the convention, the intention to desert its former mean-
ing, and to comprehend Indian tribes within it, unless the context force that
*construction on us.   We find nothing in the context, and nothing in [*20
the subject of the article, which leads to it.

The court has bestowed its best attention on this question, and, after
mature deliberation, the majority is of opinion, that an Indian tribe or nation
within the United States is not a foreign state, in the sense of the constitu-
tion, and cannot maintain an action in the courts of the United States.

A serious additional objection exists to the jurisdiction of the court.   Is
the matter of the bill the proper subject for judicial inquiry and decision?
It seeks to restrain a state from the forcible exercise of legislative power
over a neighboring people, asserting their independence ; their right to
which the state denies.   On several of the matters alleged in the bill, for
example, on the laws making it criminal to exercise the usual powers of
self-government in their own country, by the Cherokee nation, this court

Cherokee Nation v. Georgia.

cannot interpose ; at least, in the form in which those matters are presented.

That part of the bill which respects the land occupied by the Indians, and prays the aid of the court to protect their possession, may be more doubtful. The mere question of right might, perhaps, be decided by this court, in a proper case, with proper parties. But the court is asked to do more than decide on the title. The bill requires us to control the legislature of Georgia, and to restrain the exertion of its physical force. The propriety of such an interposition by the court may be well questioned ; it savors too much of the exercise of political power, to be within the proper province of the judicial department. But the opinion on the point respecting parties makes it unnecessary to decide this question.

If it be true, that the Cherokee nation have rights, this is not the tribunal in which those rights are to be asserted. If it be true, that wrongs have been inflicted, and that still greater are to be apprehended, this is not the tribunal which can redress the past or prevent the future. The motion for an injunction is denied.

JOHNSON, Justice.—In pursuance of my practice, in giving an opinion on all constitutional questions, I must present my views on this. With the morality of the case, I have no concern ; I am called upon to consider it as a legal question.

*21] *The object of this bill is to claim the interposition of this court, as the means of preventing the state of Georgia, or the public functionaries of the state of Georgia, from asserting certain rights and powers over the country and people of the Cherokee nation. It is not enough, in order to come before this court for relief, that a case of injury, or of cause to apprehend injury, should be made out. Besides having a cause of action, the complainant must bring himself within that description of parties, who alone are permitted, under the constitution, to bring an original suit to this court. It is essential to such suit, that a state of this Union should be a party ; so says the second member of the second section of the third article of the constitution ; the other party must, under the control of the eleventh amendment, be another state of the Union, or a foreign state. In this case, the averment is, that the complainant is a foreign state.

Two preliminary questions then present themselves : 1. Is the complainant a foreign state, in the sense of the constitution ? 2. Is the case presented in the bill one of judicial cognisance ? Until these questions are disposed of, we have no right to look into the nature of the controversy any further than is necessary to determine them. The first of the questions necessarily resolves itself into two : 1. Are the Cherokees a state ? 2. Are they a foreign state ?

1. I cannot but think that there are strong reasons for doubting the applicability of the epithet " state," to a people so low in the grade of organized society as our Indian tribes most generally are. I would not here be understood as speaking of the Cherokees, under their present form of government ; which certainly must be classed among the most approved forms of civil government. Whether it can be yet said to have received the consistency which entitles that people to admission into the family of nations is, I conceive, yet to be determined by the executive of these states.

Until then, I must think, that we cannot recognise it as an existing state, *under any other character than that which it has maintained hitherto as one of the Indian tribes or nations.                                                      [*22

There are great difficulties hanging over the question, whether they can be considered as states, under the judiciary article of the constitution.   1. They never have been recognised as holding sovereignty over the territory they occupy.   It is in vain now to inquire into the sufficiency of the principle, that discovery gave the right of dominion over the country discovered. When the populous and civilized nations beyond the Cape of Good Hope were visited, the right of discovery was made the ground of an exclusive right to their trade, and confined to that limit.   When the eastern coast of this continent, and especially the part we inhabit, was discovered, finding it occupied by a race of hunters, connected in society by scarcely a semblance of organic government, the right was extended to the absolute appropriation of the territory, the annexation of it to the domain of the discoverer.·  It cannot be questioned, that the right of sovereignty, as well as soil, was notoriously asserted and exercised by the European discoverers.   From that source we derive our rights, and there is not an instance of a cession of land from an Indian nation, in which the right of sovereignty is mentioned as a part of the matter ceded.

It may be suggested, that they were uniformly cessions of land, without inhabitants ; and therefore, words competent to make a cession of sovereignty were unnecessary.   This, however, is not a full answer, since soil, as well as people, is the object of sovereign action, and may be ceded, with or without the sovereignty, or may be ceded, with the express stipulation that the inhabitants shall remove.   In all the cessions to us from the civilized states of the old world, and of our transfers among ourselves, although of the same property, under the same circumstances, and even when occupied by these very Indians, the express cession of sovereignty is to be found.   In the very treaty of Hopewell, the language or evidence of which is appealed to, as the leading proof of the existence of this supposed state, we find the commissioners of the United States expressing themselves in these terms. " The commissioners plenipotentiary of the United States give peace to all the Cherokees, and receive them into the favor and protection of the *United States on the following conditions."   This is certainly the language of sovereigns and conquerors, and not the address of equals                [*23 to equals.   And again, when designating the country they are to be confined to, comprising the very territory which is the subject of this bill, they say, " Art. 4. The boundary allotted to the Cherokees for their hunting-grounds " shall be as therein described.   Certainly, this is the language of concession on our part, not theirs ; and when the full bearing and effect of those words, " for their hunting-grounds," is considered, it is difficult to think, that they were then regarded as a state, or even intended to be so regarded.   It is clear, that it was intended to give them no other rights over the territory than what were needed by a race of hunters ; and it is not easy to see, how their advancement beyond that state of society could ever have been promoted, or, perhaps, permitted, consistently with the unquestioned rights of the states, or United States, over the territory within their limits. The pre-emptive right, and exclusive right of conquest in case of war, was never questioned to exist in the states, which circumscribed the whole or

any part of the Indian grounds or territory. To have taken it from them by direct means, would have been a palpable violation of their rights. But every advance, from the hunter-state to a more fixed state of society, must have a tendency to impair that pre-emptive right, and ultimately to destroy it altogether, both by increasing the Indian population, and by attaching them firmly to the soil. The hunter-state bore within itself the promise of vacating the territory, because when game ceased, the hunter would go elsewhere to seek it. But a more fixed state of society would amount to a permanent destruction of the hope, and, of consequence, of the beneficial character of the pre-emptive right.

But it is said, that we have extended to them the means and inducement to become agricultural and civilized. It is true : and the immediate object of that policy was so obvious, as probably to have intercepted the view of ulterior consequences. Independently of the general influence of humanity, these people were restless, warlike, and signally cruel in their irruptions, during the revolution. The policy, therefore, of enticing them to the arts of peace, and to those improvements which war might lay desolate, was obvious ; *24] and it was wise, *to prepare them for what was probably then contemplated, to wit, to incorporate them in time into our respective governments ; a policy which their inveterate habits and deep-seated enmity has altogether baffled. But the project of ultimately organizing them into states, within the limits of those states which had not ceded or should not cede to the United States the jurisdiction over the Indian territory within their bounds, could not possibly have entered into the contemplation of our government. Nothing but express authority from the states could have justified such a policy, pursued with such a view.

To pursue this subject a little more categorically. If these Indians are to be called a state : then—1. By whom are they acknowledged as such ? 2. When did they become so ? 3. And what are the attributes by which they are identified with other states ?

As to the first question, it is clear, that as a state they are known to nobody on earth but ourselves, if to us : how then can they be said to be recognised as a member of the community of nations ? Would any nation on earth treat with them as such ? Suppose, when they occupied the banks of the Mississippi, or the sea coast of Florida, part of which, in fact, the Seminoles now occupy, they had declared war and issued letters of marque and reprisal against us, or Great Britain, would their commissions be respected ? If known as a state, it is by us, and us alone ; and what are the proofs ? The treaty of Hopewell does not even give them a name other than that of the Indians ; not even nation or state : but regards them as what they were, a band of hunters, occupying as hunting-grounds, just what territory we chose to allot them. And almost every attribute of sovereignty is renounced by them, in that very treaty. They acknowledge themselves to be under the sole and exclusive protection of the United States. They receive the territory allotted to them as a boon, from a master or conqueror ; the right of punishing intruders into that territory is conceded, not asserted as a right ; and the sole and exclusive right of regulating their trade and managing all their affairs in such manner as the government of *25] the United States shall think proper ; amounting in terms to a relinquishment of all *power, legislative, executive and judicial, to the

Cherokee Nation v. Georgia.

United States, is yielded in the ninth article. It is true, that the twelfth article gives power to the Indians to send a deputy to congress ; but such deputy, though dignified by the name, was nothing and could be nothing but an agent, such as any other company might be represented by. It cannot be supposed, that he was to be recognised as a minister, or to sit in the congress as a delegate. There is nothing express and nothing implied, that would clothe him with the attributes of either of these characters. As to a seat among the delegates, it could not be granted to him.

There is one consequence that would necessarily flow from the recognition of this people as a state, which of itself must operate greatly against its admission. Where is the rule to stop ? Must every petty kraal of Indians, designating themselves a tribe or nation, and having a few hundred acres of land to hunt on exclusively, be recognised as a state ? We should, indeed, force into the family of nations, a very numerous and very heterogeneous progeny. The Catawbas, having, indeed, a few more acres than the republic of San Marino, but consisting only of eighty or an hundred polls, would then be admitted to the same dignity. They still claim independence, and actually execute their own penal laws, such as they are, even to the punishment of death ; and have recently done so. We have many ancient treaties with them ; and no nation has been more distinctly recognised, as far as such recognition can operate to communicate the character of a state.

But secondly, at what time did this people acquire the character of a state ? Certainly, not by the treaty of Hopewell ; for every provision of that treaty operates to strip it of its sovereign attributes ; and nothing subsequent adds anything to that treaty, except using the word nation instead of Indians. And as to that article in the treaty of Holston, and repeated in the treaty of Tellico, which guaranties to them their territory, since both those treaties refer to and confirm the treaty of Hopewell ; on what principle can it be contended, that the guarantee can go further than to secure to them that right over the territory, which is conceded by the Hopewell treaty ; which interest is only that of hunting-grounds. The general policy of the *United States, which always looked to these Indian lands as a certain future acquisition, not less than the express words of the [*26 treaty of Hopewell, must so decide the question.

If they were not regarded as one of the family of nations, at the time of that treaty, even though, at that time, first subdued and stripped of the attributes of a state, it is clear, that, to be regarded now as a state, they must have resumed their rank among nations, at some subsequent period. But at what subsequent period ? Certainly, by no decisive act, until they organized themselves recently into a government ; and I have before remarked, that, until expressly recognised by the executive, under that form of government, we cannot recognise any change in their form of existence. Others have a right to be consulted on the admission of new states into the national family. When this country was first appropriated or conquered by the crown of Great Britain, they certainly were not known as members of the community of nations ; and if they had been, Great Britain, from that time, blotted them from among the race of sovereigns. From that time, Great Britain considered them as her subjects, whenever she chose to claim their allegiance ; and their country as hers, both in soil and

sovereignty. All the forbearance exercised towards them was considered as voluntary, and as their trade was more valuable to her than their territory, for that reason, and not from any supposed want of right to extend her laws over them, did she abstain from doing so.

And thirdly, by what attributes is the Cherokee nation identified with other states? The right of sovereignty was expressly assumed by Great Britain over their country, at the first taking possession of it; and has never since been recognised as in them, otherwise than as dependent upon the will of a superior. The right of legislation is, in terms, conceded to congress, by the treaty of Hopewell, whenever they choose to exercise it. And the right of soil is held by the feeble tenure of hunting-grounds, and acknowledged on all hands subject to a restriction to sell to no one but the United States, and for no use but that of Georgia. They have, in Europe, sovereign and demi-sovereign states, and states of doubtful sovereignty. But this state, if it be *a state, is still a grade below them all; for *27] not to be able to alienate, without permission of the remainder-man or lord, places them in a state of feudal dependence.

However, I will enlarge no more upon this point; because I believe, in one view, and in one only, if at all, they are or may be deemed a state, though not a sovereign state, at least, while they occupy a country within our limits. Their condition is something like that of the Israelities, when inhabiting the deserts. Though without land that they can call theirs in the sense of property, their right of personal self-government has never been taken from them; and such a form of government may exist, though the land occupied be in fact that of another. The right to expel them may exist in that other, but the alternative of departing, and retaining the right of self-government, may exist in them. And such they certainly do possess; it has never been questioned, nor any attempt made at subjugating them as a people, or restraining their personal liberty, except as to their land and trade.

But in no sense can they be deemed a foreign state, under the judiciary article. It does seem unnecessary, on this point, to do more than put the question, whether the makers of the constitution could have intended to designate them, when using the epithets "foreign" and "state." State, and foreign state, are used in contradistinction to each other. We had then just emerged ourselves from a situation having much stronger claims than the Indians for admission into the family of nations; and yet we were not admitted, until we had declared ourselves no longer provinces, but states, and showed some earnestness and capacity in asserting our claim to be enfranchised. Can it then be supposed, that when using those terms, we meant to include any others than those who were admitted into the community of nations, of whom, most notoriously, the Indians were no part?

The argument is, that they were states; and if not states of the Union, must be foreign states. But I think it very clear, that the constitution neither speaks of them as states or foreign states, but as just as what they were, Indian tribes; an anomaly unknown to the books that treat of states, and which the law of nations would regard as nothing more than wandering hordes, held together only by ties of blood and habit, and *having *28] neither laws nor government, beyond what is required in a savage state. The distinction is clearly made in that section which vests in congress

Cherokee Nation v. Georgia.

power to regulate commerce between the United States with foreign nations, and the Indian tribes.

The language must be applied in one of three senses ; either in that of the law of nations, or of the vernacular use, or that of the constitution. In the first, although it means any state not subject to our laws, yet it must be a state and not a hunter horde ; in the vernacular, it would not be applied to a people within our limits and at our very doors ; and in the constitution, the two epithets are used in direct contradistinction ; the latter words were unnecessary, if the first included the Indian tribes. There is no ambiguity, though taken literally ; and if they were, facts and circumstances altogether remove it.

But had I been sitting alone in this cause, I should have waived the consideration of personal description altogether ; and put my rejection of this motion upon the nature of the claim set up, exclusively. I cannot entertain a doubt, that it is one of a political character altogether, and wholly unfit for the cognisance of a judicial tribunal. There is no possible view of the subject, that I can perceive, in which a court of justice can take jurisdiction of the questions made in the bill. The substance of its allegations may be thus set out. That the complainants have been, from time immemorial, lords of the soil they occupy. That the limits by which they hold it have been solemnly designated and secured to them by treaty, and by laws of the United States. That within those limits, they have rightfully exercised unlimited jurisdiction, passing their own laws and administering justice in their own way. That in violation of their just rights, so secured to them, the state of Georgia has passed laws, authorizing and requiring the executive and judicial powers of the state to enter their territory and put down their public functionaries. That in pursuance of those laws the functionaries of Georgia have entered their territory with an armed force, and put down all powers legislative, executive and judicial, exercised under the government of the Indians.

What does this series of allegations exhibit, but a state *of war, and the fact of invasion ? They allege themselves to be a sovereign [*29 independent state, and set out that another sovereign state has, by its laws, its functionaries, and its armed force, invaded their state and put down their authority. This is war, in fact ; though not being declared with the usual solemnities, it may perhaps be called war in disguise. And the contest is distinctly a contest for empire. It is not a case of *meum* and *tuum*, in the judicial, but in the political sense. Not an appeal to laws, but to force. A case in which a sovereign undertakes to assert his right upon his sovereign responsibility ; to right himself, and not to appeal to any arbiter but the sword, for the justice of his cause. If the state of Maine were to extend its laws over the province of New Brunswick, and send its magistrates to carry them into effect, it would be a parallel case. In the *Nabob of Arcot's Case* (3 Bro. C. C. 292 ; s. c. 1 Ves. jr. 371 ; 2 Ibid. 56), a case of a political character not one half so strongly marked as this, the courts of Great Britain refused to take jurisdiction, because it had its origin in treaties entered into between sovereign states : a case in which the appeal is to the sword and to Almighty justice, and not to courts of law or equity. In the exercise of sovereign right, the sovereign is sole arbiter of his own justice. The penalty of wrong is war and subjugation.

But there is still another ground, in this case, which alone would have prevented me from assuming jurisdiction ; and that is, the utter impossibility of doing justice, at least, even-handed justice, between the parties. As to restoring the complainant to the exercise of jurisdiction, it will be seen at once, that this is no case for the action of a court ; and as to quieting him in possession of the soil, what is the case on which the complainant would have this court to act ?   Either the Cherokee nation are a foreign state, or they are not.   If they are not, then they cannot come here ; and if they are, then how can we extend our jurisdiction into their country ?

We are told, that we can act upon the public functionaries in the state of Georgia, without the limits of the nation.   But suppose, that Georgia should file a cross-bill, as she certainly may, if we can entertain jurisdiction in this case ; and should, in her bill, claim to be put in possession of the whole Indian country ; and we should decide in her favor ; how is *that decree to be carried into effect ?   Say, as to soil ; as to jurisdiction, it is not even to be considered.   From the complainant's own showing, we could not do justice between the parties.   Nor must I be considered as admitting that this court could, even upon the other alternative, exercise a jurisdiction over the person, respecting lands under the jurisdiction of a foreign nation.   I know of no such instance.   In *Penn* v. *Lord Baltimore*, the persons were in England, and the land within the king's dominions, though in America.

There is still another view in which this cause of action may be considered in regard to its political nature.   The United States, finding themselves involved in conflicting treaties, or, at least, in two treaties respecting the same property, under which two parties assert conflicting claims ; one of the parties, putting itself upon its sovereign right, passes laws which in effect declare the laws and treaties under which the other party claims, null and void.   It proceeds to carry into effect those laws, by means of physical force ; and the other party appeals to the executive department for protection. Being disappointed there, the party appeals to this court, indirectly to compel the executive to pursue a course of policy, which his sense of duty, or ideas of the law, may indicate should not be pursued.   That is, to declare war against a state, or to use the public force to repel the force, and resist the laws of a state, when his judgment tells him the evils to grow out of such a course may be incalculable.   What these people may have a right to claim of the executive power is one thing ; whether we are to be the instruments to compel another branch of the government to make good the stipulations of treaties, is a very different question.   Courts of justice are properly excluded from all considerations of policy, and therefore, are very unfit instruments to control the action of that branch of government, which may often be compelled, by the highest considerations of public policy, to withhold even the exercise of a positive duty.

There is then a great deal of good sense in the rule laid down in the *Nabob of Arcot's Case*, to wit, that as between sovereigns, breaches of treaty were not breaches of contract cognisable in a court of justice ; independent of the general principle, that for their political acts, states were not amenable to tribunals of justice.

*There is yet another view of this subject, which forbids our taking jurisdiction.   There is a law of the United States, which purports

Cherokee Nation v. Georgia.

to make every trespass set out in the bill to be an offence cognisable in the courts of the United States. I mean the act of 1802, which makes it penal to violate the Indian territory. The infraction of this law is in effect the burden of complaint. What then, in fact, is this bill, but a bill to obtain an injunction against the commission of crimes? If their territory has been trespassed upon, against the provisions of that act, no law of Georgia could repeal that act, or justify the violation of its provisions. And the remedy lies in another court and form of action, or another branch of jurisprudence.

I cannot take leave of the case, without one remark upon the leading argument, on which the exercise of jurisdiction here over cases occurring in the Indian country, has been claimed for the complainant; which was, that the United States, in fact, exercised jurisdiction over it, by means of this and other acts, to punish offences committed there. But this argument cannot bear the test of principle. For the jurisdiction of a country may be exercised over her citizens, wherever they are, in right of their allegiance; as it has been in the instance of punishing offences committed against the Indians. And also, both under the constitution and the treaty of Hopewell, the power of congress extends to regulating their trade, necessarily within their limits. But this cannot sanction the exercise of jurisdiction, beyond the policy of the acts themselves, which are altogether penal in their provisions. I vote for rejecting the motion.

BALDWIN, Justice.—As jurisdiction is the first question which must arise in every cause, I have confined my examination of this, entirely to that point, and that branch of it which relates to the capacity of the plaintiffs to ask the interposition of this court. I concur in the opinion of the court, in dismissing the bill, but not for the reasons assigned. In my opinion, there is no plaintiff in this suit; and this opinion precludes any examination into the merits of the bill, or the weight of any minor objections. My judgment stops *me at· the threshold, and forbids me to examine into the acts complained of. [*32

As the reasons for the judgment of the court seem to me more important than the judgment itself, in its effects on the peace of the country, and the condition of the complainants, and as I stand alone on one question of vital concern to both; I must give my reasons in full. The opinion of this court is of high authority in itself; and the judge who delivers it has a support as strong in moral influence over public opinion, as any human tribunal can impart. The judge, who stands alone in decided dissent on matters of the infinite magnitude which this case presents, must sink under the continued and unequal struggle; unless he can fix himself by a firm hold on the constitution and laws of the country. He must be presumed to be in the wrong, until he proves himself to be in the right. Not shrinking even from this fearful issue, I proceed to consider the only question which I shall ever examine in relation to the rights of Indians to sue in the federal courts, until convinced of my error in my present convictions.

My view of the plaintiffs being a sovereign independent nation or foreign state, within the meaning of the constitution, applies to all the tribes with whom the United States have held treaties; for if one is a foreign nation or state, all others, in like condition, must be so, in their aggregate

capacity ; and each of their subjects or citizens, aliens, capable of suing in the circuit courts. This case, then, is the case of the countless tribes, who occupy tracts of our vast domain ; who, in their collective and individual characters, as states or aliens, will rush to the federal courts, in endless controversies, growing out of the laws of the states or of congress.

In the spirit of the maxim *obsta principiis*, I shall first proceed to the consideration of the proceedings of the old congress, from the commencement of the revolution up to the adoption of the constitution ; so as to ascertain whether the Indians were considered and treated with, as tribes of savages, or independent nations, foreign states, on an equality with any other foreign state or nation ; and whether Indian affairs were viewed as those of foreign nations, and in connection with this view, refer to the acts of the federal government on the same subject.

*33]　　*In 1781 (1 Laws U. S. 586), a department for foreign affairs was established, to which was intrusted all correspondence and communication with the ministers or other officers of foreign powers, to be carried on through that office ; also with the governors and presidents of the several states ; and to receive the applications of all foreigners, letters of sovereign powers, plans of treaties, conventions, &c., and other acts of congress relative to the department of foreign affairs ; and all communications, as well to as from the United States in congress assembled, were to be made through the secretary, and all papers on the subject of foreign affairs to be addressed to him. The same department was established under the present constitution in 1789, and with the same exclusive control over all the foreign concerns of this government with foreign states or princes. (2 Laws U. S. 6, 7.) In July 1775, congress established a department of Indian affairs, to be conducted under the superintendence of commissioners. (1 Ibid. 597.) By the ordinance of August 1786, for the regulation of Indian affairs, they were placed under the control of the war department (Ibid. 614) ; continued there by the act of August 1789 (2 Ibid. 32, 33), under whose direction they have ever since remained. · It is clear, then, that neither the old nor new government did ever consider Indian affairs, the regulation of our intercourse or treaties with them, as forming any part of our foreign affairs or concerns with foreign nations, states or princes.

I will next inquire, how the Indians were considered ; whether as independent nations, or tribes with whom our intercourse must be regulated by the law of circumstances. In this examination, it will be found, that different words have been applied to them in treaties and resolutions of congress ; nations, tribes, hordes, savages, chiefs, sachems and warriors of the Cherokees, for instance, or the Cherokee nation. I shall not stop to inquire into the effect which a name or title can give to a resolve of congress, a treaty or convention with the Indians, but into the substance of the thing done, and the subject-matter acted on ; believing it requires no reasoning to prove, that the omission of the words prince, state, sovereignty or nation, cannot

*34]　　divest a contracting party of these *national attributes, which are inherent in sovereign power pre- and self-existing, or confer them, by their use, where all the substantial requisites of sovereignty are wanting.

The proceedings of the old congress will be found in 1 Laws U. S. 597, commencing 1st June 1775, and ending 1st September 1788, of which some

extracts will be given. 30th June 1775 : "Resolved, that the committee for Indian affairs do prepare proper talks to the several tribes of Indians; as the Indians depend on the colonists for arms, ammunition and clothing, which are become necessary for their subsistence." "That the commissioners have power to treat with the Indians ;" "to take to their assistance gentlemen of influence among the Indians." "To preserve the confidence and friendship of the Indians, and prevent their suffering for want of the necessaries of life, 40,000*l.* sterling of Indian goods be imported."- "No person shall be permitted to trade with the Indians, without a license ;" "traders shall sell their goods at reasonable prices ; allow them to the Indians for their skins, and take no advantage of their distress and intemperance ;" "the trade to be only at posts designated by the commissioners." Specimens of the kind of intercourse between the congress and deputations of Indians may be seen in pages 602 and 603. They need no incorporation into a judicial opinion.

In 1782, a committee of congress report, that all the lands belonging to the Six Nations of Indians have been in due form put under the crown, as appendant to the government of New York, so far as respects jurisdiction only ; that that colony has borne the burden of protecting and supporting the Six Nations of Indians, and their tributaries, for one hundred years, as the dependents and allies of that government ; that the crown of England has always considered and treated the country of the Six Nations as one appendant to the government of New York ; that they have been so recognised and admitted, by their public acts, by Massachusetts, Connecticut, Pennsylvania, Maryland and Virginia ; that by accepting this cession, the jurisdiction of the whole western territory, belonging to the Six Nations and their tributaries, will be vested in the United States, greatly to the advantage of the Union (p. 606). The cession alluded to is the *one from New York, March 1st, 1781, of the soil and jurisdiction of all [*35 the land in their charter, west of the present boundary of Pennsylvania (1 Laws of U. S. 471), which was executed in congress and accepted.

This makes it necessary to break in on the historical trace of our Indian affairs, and follow up this subject to the adoption of the constitution. The cession from Virginia in 1784 was of soil and jurisdiction. So, from Massachusetts in 1785, from Connecticut in 1800, from South Carolina in 1787, from Georgia in 1802. North Carolina made a partial cession of land, but a full one of her sovereignty and jurisdiction of all without her present limits in 1789. (2 Laws U. S. 85.) Some states made reservations of lands to a small amount, but, by the terms of the cession, new states were to be formed within the ceded boundaries, to be admitted into the Union on an equal footing with the original states ; of course, not shorn of their powers of sovereignty and jurisdiction, within the boundaries assigned by congress to the new states. In this spirit, congress passed the celebrated ordinance of July 1787, by which they assumed the government of the north-western territory, paying no regard to Indian jurisdiction, sovereignty, or their political rights, except providing for their protection ; authorizing the adoption of laws "which, for the prevention of crimes and injuries, shall have force in all parts of the district ; and for the execution of process, civil and criminal, the governor has power to make proper division thereof." (1 Laws U. S. 477.) By the fourth article, the said terri-

tory, and the states which may be formed therein, shall for ever remain a part of this confederacy of the United States ; subject to the articles of confederation, alterations constitutionally made, the acts and ordinances of congress.   This shows the clear meaning and understanding of all the ceding states, and of congress, in accepting the cession of their western lands, up to the time of the adoption of the constitution.  The application of these acts to the provisions of the constitution will be considered hereafter.   A few more references to the proceedings of the old congress, in relation to the Indian nations, will close this view of the case.

*36]   *In 1782, a committee, to whom was referred a letter from the secretary at war, reported, " that they have had a conference with the two deputies from the Catawba nation of Indians ; that their mission respects certain tracts of land reserved for their use, in the state of South Carolina, which they wish may be so secured to their tribe, as not to be intruded into by force, nor alienated even with their own consent :—Whereupon, resolved, that it be recommended to the legislature of South Carolina to take such measures for the satisfaction and security of the said tribe, as the said legislature shall in their wisdom think fit."   (1 Laws U. S. 667.)   After this, the Catawbas cannot well be considered an independent nation or foreign state. In September 1783, shortly after the preliminary treaty of peace, congress, exercising the powers of acknowledged independence and sovereignty, issued a proclamation, beginning in these words : " whereas, by the ninth of the articles of confederation, it is, among other things, declared, that the United States in congress assembled, have the sole and exclusive right and power of regulating the trade, and managing all affairs with the Indians, not members of any of the states, provided that the legislative right of every state, within its own limits be not infringed or violated ;" prohibiting settlements on lands inhabited or claimed by Indians, without the limits or jurisdiction of any particular state, and from purchasing or receiving gifts of land, without the express authority and directions of the United States in congress assembled. Conventions were to be held with the Indians in the northern and middle departments, for the purpose of receiving them into the favor and protection of the United States, and of establishing boundary lines of property, for separating and dividing the settlements of the citizens from the Indian villages and hunting-grounds, &c.   " Resolved, that the preceding measures of congress, relative to Indian affairs, shall not be construed to affect the territorial claims of any of the states, or their legislative rights, within their respective limits.   Resolved, that it will be wise and necessary, to erect a district of the western territory into a distinct government, and that a committee be appointed to prepare a plan for a temporary government, until the inhabitants shall form a permanent constitution *for themselves, and *37]   as citizens of a free, sovereign and independent state, be admitted to a representation in the Union."   In 1786, a general ordinance was passed for the regulation of Indian affairs under the authority of the ninth article of the confederation, which throws much light on our relations with them (page 614).   It closes with a direction, that in all cases where transactions with any nation or tribe of Indians shall become necessary for the purposes of the ordinance, which cannot be done without interfering with the legislative rights of a state, the superintendent within whose district the same shall happen, shall act in conjunction with the authority of such state.   After

accepting the cessions of the soil and jurisdiction of the western territory, and resolving to form a temporary government, and create new, free, sovereign and independent states, congress resolved, in March 1785, to hold a treaty with the western Indians. They gave instructions to the commissioners, in strict conformity with their preceding resolutions, both of which were wholly incompatible with the national or sovereign character of the Indians with whom they were about to treat. They will be found in pages 611, &c., and need not be particularized.

I now proceed to the instructions which preceded the treaty of Hopewell with the complainants, the treaty, and the consequent proceedings of congress. On the 15th March 1785, commissioners were appointed to treat with the Cherokees and other Indians, southward of them, within the limits of the United States, or who have been at war with them, for the purpose of making peace with them, and of receiving them into the favor and protection of the United States, &c. They were instructed to demand that all prisoners, negroes and other property, taken during the war, be given up ; to inform the Indians of the great occurrences of the last war ; of the extent of country relinquished by the late treaty of peace with Great Britain ; to give notice to the governors of Virginia, North and South Carolina and Georgia, that they may attend, if they think proper ; and were authorized to expend $4000 in making presents to the Indians ; a matter well understood in making Indian treaties, but unknown, at least, in our treaties with foreign nations, princes *or states, unless on the Barbary coast. A treaty was accordingly made, in November following, between the commissioners [*38 plenipotentiaries of the United States, of the one part, and the head-men and warriors of all the Cherokees, of the other. The word nation is not used in the preamble, nor any part of the treaty, so that we are left to infer the capacity in which the Cherokees contracted, whether as an independent nation, or foreign state, or a tribe of Indians, from the terms of the treaty, its stipulations and conditions. " The Indians, for themselves and their respective tribes and towns, do acknowledge all the Cherokees to be under the protection of the United States." (Art. 3, 1 Laws U. S. 322.) " The boundary allotted to the Cherokees for their hunting-grounds between the said Indians and the citizens of the United States, within the limits of the United States, is and shall be the following," viz. (as defined in Art. 4.) " For the benefit and comfort of the Indians, and for the prevention of injuries and aggressions on the part of the citizens or Indians, the United States, in congress assembled, shall have the sole and exclusive right of regulating the trade with the Indians, and managing all their affairs in such manner as they shall think proper." (Art. 9.) " That the Indians may have full confidence in the justice of the United States respecting their interests, they shall have the right to send a deputy of their choice, whenever they think fit, to congress." (Art. 12.)

This treaty is, in the beginning, called "article :" the word "treaty" is only to be found in the concluding line, where it is called "this definitive treaty." But article or treaty, its nature does not depend upon the name given it. It is not negotiated between ministers on both sides, representing their nations ; the stipulations are wholly inconsistent with sovereignty ; the Indians acknowledge their dependent character ; hold the lands they occupy as an allotment of hunting-grounds ; give to congress the exclusive right of

regulating their trade, and managing all their affairs, as they may think proper. So it was understood by congress, as declared by them in their proclamation of 1st September 1788 (1 U. S. Laws 619), and so understood at the adoption of the constitution.

*39]     *The meaning of the words "deputy to congress" in the twelfth article, may be as a person having a right to sit in that body, as, at that time, it was composed of delegates or deputies from the states, not as at present, representatives of the people of the states; or it may be as an agent or minister. But if the former was the meaning of the parties, it is conclusive to show, that he was not and could not be the deputy of a foreign state, wholly separated from the Union. If he sat in congress as a deputy from any state, it must be one having a political connection with, and within the jurisdiction of, the confederacy; if as a diplomatic agent, he could not represent an independent or sovereign nation, for all such have an unquestioned right to send such agents, when and where they please. The securing the right, by an express stipulation of the treaty; the declared objects in conferring the right, especially, when connected with the ninth article; show beyond a doubt, it was not to represent a foreign state or nation, or one to whom the least vestige of independence or sovereignty as to the United States appertained. There can be no dependence so anti-national, or so utterly subversive, of national existence, as transferring to a foreign government the regulation of its trade, and the management of all their affairs, at their pleasure. The nation or state, tribe or village, head-men or warriors of the Cherokees, call them by what name we please; call the articles they have signed a definitive treaty, or an indenture of servitude; they are not, by its force or virtue, a foreign state, capable of calling into legitimate action the judicial power of this Union, by the exercise of the original jurisdiction of this court, against a sovereign state, a component part of this nation. Unless the constitution has imparted to the Cherokees a national character, never recognised under the confederation; and which, if they ever enjoyed, was surrendered by the treaty of Hopewell; they cannot be deemed, in this court, plaintiffs in such a case as this.

In considering the bearing of the constitution on their rights, it must be borne in mind, that a majority of the states represented in the convention had ceded to the United States the soil and jurisdiction of their western lands, or claimed it to be remaining in themselves; that congress asserted, as to the ceded, and the states, as to the unceded territory, their right to the soil absolutely, and the dominion in full sovereignty, *within their respective limits, subject only to Indian occupancy, not as foreign states or nations, but as dependent on, and appendant to the state governments; that before the convention acted, congress had erected a government in the north-western territory, containing numerous and powerful nations or tribes of Indians, whose jurisdiction was contemned, and whose sovereignty was overturned, if it ever existed, except by permission of the states or congress, by ordaining, that the territorial laws should extend over the whole district; and directing divisions for the execution of civil and criminal process in every part; that the Cherokees were then dependents, having given up all their affairs to the regulation and management of congress, and that all the regulations of congress over Indian affairs, were then in force over an immense territory, under a solemn pledge to the inhabitants, that

*40]

Cherokee Nation v. Georgia.

whenever their population and circumstances would admit, they should form constitutions, and become free, sovereign and independent states, on equal footing with the old compenent members of the confederation ; that by the existing regulations and treaties, the Indian tenure to their land was their allotment as hunting-grounds, without the power of alienation, that the right of occupancy was not individual, that the Indians were forbidden all trade or intercourse with any person, not licensed, or at a post not designated by regulation ; that Indian affairs formed no part of the foreign concerns of the government, and that though they were permitted to regulate their internal affairs in their own way, it was not by any inherent right, acknowledged by congress or reserved by treaty, but because congress did not think proper to exercise the sole and exclusive right, declared and asserted in all their regulations from 1775 to 1788, in the articles of confederation, in the ordinance of 1787, and the proclamation of 1788 ; which the plaintiffs solemnly recognised and expressly granted by the treaty of Hopewell, in 1785, as conferred on congress, to be exercised as they should think proper.

To correctly understand the constitution, then, we must read it with reference to this well-known existing state of our relations with the Indians; the United States asserting the right of soil, sovereignty and jurisdiction, in full dominion ; the Indians, occupancy of allotted hunting-grounds.

We can thus expound the constitution, without a reference *to the definitions of a state or nation by any foreign writer, hypothetical [*41 reasoning, or the dissertations of the Federalist. This would be to substitute individual authority in place of the declared will of the sovereign power of the Union, in a written fundamental law. Whether it is the emanation from the people or the states, is a moot question, having no bearing on the supremacy of that supreme law which, from a proper source, has rightfully been imposed on us by sovereign power. Where its terms are plain, I should, as a dissenting judge, deem it judicial sacrilege to put my hands on any of its provisions, and arrange or construe them according to any fancied use, object, purpose or motive, which, by an ingenious train of reasoning I might bring my mind to believe was the reason for its adoption by the sovereign power, from whose hands it comes to me as the rule and guide to my faith, my reason and judicial oath. In taking out, putting in, or varying the plain meaning of a word or expression, to meet the results of my poor judgment, as to the meaning and intention of the great charter, which alone imparts to me my power to act as a judge of its supreme injunctions, I should feel myself acting upon it by judicial amendments, and not as one of its executors. I will not add unto these things ; I will not take away from the words of this book of prophecy ; I will not impair the force or obligation of its enactments, plain and unqualified in its terms, by resorting to the authority of names ; the decisions of foreign courts ; or a reference to books or writers. The plain ordinances are a safe guide to my judgment. When they admit of doubt, I will connect the words with the practice, usages and settled principles of this government, as administered by its fathers, before the adoption of the constitution ; and refer to the received opinion and fixed understanding of the high parties who adopted it ; the usage and practice of the new government, acting under its authority ; and the solemn decisions of this court, acting under its high powers and responsibility ; nothing fearing, that in so doing, I can discover some sound and

safe maxims of American policy and jurisprudence, which will always afford me light enough to decide on the constitutional powers of the federal and state governments, and all tribunals acting under their authority. They will, at least, enable me to judge of the true meaning and *spirit of plain words, put into the forms of constitutional provisions, which this court, in the great case of *Sturges* v. *Crowninshield*, say, "is to be collected chiefly from its words. It would be dangerous in the extreme, to infer from extrinsic circumstances, that a case for which the words of an instrument expressly provide, shall be exempted from its operation. Where words conflict with each other, where the different clauses of an instrument bear upon each other, and would be inconsistent, unless the natural and common import of words be varied, constructions become necessary, and a departure from the obvious meaning of words is justifiable." But the absurdity and injustice of applying the provision to the case, must be so monstrous, that all mankind would, without hesitation, unite in rejecting the application. 4 Wheat. 202–3. In another great case, *Cohens* v. *Virginia*, this court say, "the jurisdiction of this court then, being extended, by the letter of the constitution, to all cases arising under it, or under the laws of the United States, it follows, that those who would withdraw any case of this description from that jurisdiction, must sustain the exemption they claim, on the spirit and true meaning of the constitution, which spirit and true meaning must be so apparent as to overrule the words which its framers have employed." 6 Wheat. 379–80. The principle of these cases is my guide in this. Sitting here, I shall always bow to such authority; and require no admonition to be influenced by no other, in a case where I am called on to take a part in the exercise of the judicial power over a sovereign state.

Guided by these principles, I come to consider the third clause of the second section of the first article of the constitution; which provides for the apportionment of representatives and direct taxes "among the several states which may be included within this Union, according to their respective numbers, excluding Indians not taxed." This clause embraces not only the old but the new states to be formed out of the territory of the United States, pursuant to the resolutions and ordinances of the old congress, and the conditions of the cession from the states, or which might arise by the division of the old. If the clause excluding Indians not taxed had not been inserted, or should be stricken out, the whole free Indian *population of all the states would be included in the federal numbers, co-extensively with the boundaries of all the states included in this Union. The insertion of this clause conveys a clear definite declaration, that there were no independent sovereign nations or states, foreign or domestic, within their boundaries, which should exclude them from the federal enumeration, or any bodies or communities within the states, excluded from the action of the federal constitution, unless by the use of express words of exclusion. The delegates who represented the states in the convention well knew the existing relations between the United States and the Indians, and put the constitution in a shape for adoption, calculated to meet them; and the words used in this clause exclude the existence of the plaintiffs as a sovereign or foreign state or nation, within the meaning of this section, too plainly to require illustration or argument.

The third clause of the eighth article shows most distinctly the sense of

the convention in authorizing congress to regulate commerce with the Indian tribes. The character of the Indian communities had been settled by many years of uniform usuage, under the old government; characterized by the names of nations, towns, villages, tribes, head-men and warriors, as the writers of resolutions or treaties might fancy; governed by no settled rule, and applying the word nation to the Catawbas as well as the Cherokees. The framers of the constitution have thought proper to define their meaning to be, that they were not foreign nations nor states of the Union, but Indian tribes; thus declaring the sense in which they should be considered, under the constitution, which refers to them as tribes only, in this clause. I cannot strike these words from the book; nor construe Indian tribes, in this part of the constitution, to mean a sovereign state, under the first clause of the second section of the third article. It would be taking very great liberty, in the exposition of a fundamental law, to bring the Indians under the action of the legislative power as tribes, and of the judicial, as foreign states. The power conferred to regulate commerce with the Indian tribes, is the same given to the old congress, by the ninth article of the old confederation, " to regulate trade with the Indians." The raising the word "trade" to the dignity of commerce, *regulating it with Indians or Indian tribes, is only a change of words. Mere [*44 phraseology cannot make Indians nations, nor Indian tribes, foreign states.

The second clause of the third section of the fourth article of the constitution is equally convincing. "The congress shall have power to dispose of, and make all needful regulations and rules respecting, the territory of the United States." What that territory was, the rights of soil, jurisdiction and sovereignty claimed and exercised by the states and the old congress, has been already seen. It extended to the formation of a government whose laws and process were in force within its whole extent, without a saving of Indian jurisdiction. It is the same power which was delegated to the old congress, and according to the judicial interpretation given by this court in *Gibbons* v. *Ogden*, 9 Wheat. 209, the word "to regulate" implied, in its nature, full power over the thing to be regulated; it excludes, necessarily, the action of all others that would perform the same operation on the same thing. Applying this construction to commerce and territory, leaves the jurisdiction and sovereignty of the Indian tribes wholly out of the question. The power given in this clause is of the most plenary kind. Rules and regulations respecting the territory of the United States—they necessarily include complete jurisdiction. It was necessary to confer it, without limitation, to enable the new government to redeem the pledge given by the old, in relation to the formation and powers of the new states. The saving of "the claims" of "any particular states," is almost a copy of a similar provision, part of the ninth article of the old confederation; thus delivering over to the new congress the power to regulate commerce with the Indian tribes, and regulate the territory they occupied, as the old had done, from the beginning of the revolution.

The only remaining clause of the constitution to be considered is the second clause in the sixth article. "All treaties made, or to be made, shall be the supreme law of the land." In *Chirac* v. *Chirac*, this court declared, that it was unnecessary to inquire into the effect of the treaty with France in 1778, under the old confederation, because the confederation had yielded

29

to our present constitution, and this treaty had been the supreme law of the land. 2 Wheat. 271. I *consider the same rule as applicable to Indian treaties, whether considered as national compacts between sovereign powers, or as articles, agreements, contracts, or stipulations on the part of this government, binding and pledging the faith of the nation to the faithful observance of its conditions. They secure to the Indians the enjoyment of the rights they stipulate to give or secure, to their full extent, and in the plenitude of good faith ; but the treaties must be considered as the rules of reciprocal obligations. The Indians must have their rights ; but must claim them in that capacity in which they received the grant or guarantee. They contracted, by putting themselves under the protection of the United States, accepted of an allotment of hunting-grounds, surrendered and delegated to congress the exclusive regulation of their trade, and the management of all their own affairs, taking no assurance of their continued sovereignty, if they had any before, but relying on the assurance of the United States that they might have full confidence in their justice respecting their interests ; stipulating only for the right of sending a deputy of their own choice to congress. If, then, the Indians claim admission to this court, under the treaty of Hopewell, they cannot be admitted as foreign states, and can be received in no other capacity.

The legislation of congress under the constitution, in relation to the Indians, has been in the same spirit, and guided by the same principles, which prevailed in the old congress, and under the old confederation. In order to give full effect to the ordinance of 1787, in the north-west territory, it was adapted to the present constitution of the United States in 1789 (1 U. S. Stat. 50) ; applied as the rule for its government to the territory south of the Ohio in 1790, except the sixth article (Ibid. 123) ; to the Mississippi territory in 1798 (Ibid. 549) ; and with no exception, to Indiana in 1800 (2 Ibid. 58) ; to Michigan in 1805 (Ibid. 309) ; to Illinois in 1809 (Ibid. 514).

In 1802, congress passed the act regulating trade and intercourse with the Indian tribes, in which they assert all the rights exercised over them under the old confederation, and do not alter in any degree their political relations. (2 U. S. Stat. 139.) In the same year, Georgia ceded her lands west of her present boundary to the United States ; and by the *second article of the convention, the United States ceded to Georgia whatever claim, right or title they may have to the jurisdiction or soil of any lands south of Tennessee, North or South Carolina and east of the line of the cession by Georgia. So that Georgia now has all the rights attached to her by her sovereignty, within her limits, and which are saved to her by the second section of the fourth article of the constitution, and all the United States could cede either by their power over the territory, or their treaties with the Cherokees.

The treaty with the Cherokees, made at Holston, in 1791, contains only one article which has a bearing on the political relations of the contracting parties. In the second article, the Cherokees stipulate " that the said Cherokee nation will not hold any treaty with any foreign power, individual state, or with individuals of any state." (7 U. S. Stat. 39.) This affords an instructive definition of the words nation and treaty. At the treaty of Hopewell, the Cherokees, though subdued and suing for peace, before divest-

Cherokee Nation v. Georgia.

ing themselves of any of the rights or attributes of sovereignty which this government ever recognised them as possessing by the consummation of the treaty, contracted in the name of the head-men and warriors of all the Cherokees ; but at Holston, in 1791, in abandoning their last remnant of political right, contracted as the Cherokee nation, thus ascending in title as they descended in power, and applying the word treaty to a contract with an individual : this consideration will divest words of their magic.

In thus testing the rights of the complainants as to their national character, by the old confederation, resolutions and ordinances of the old congress, the provisions of the constitution, treaties held under the authority of both, and the subsequent legislation thereon, I have followed the rule laid down for my guide by this court, in *Foster* v. *Neilson*, 2 Pet. 307, in doing it " according to the principles established by the political department of the government." "If the course of the nation has been a plain one, its courts would hesitate to pronounce it erroneous. However individual judges may construe them (treaties), it is the province of· the court to conform its decisions *to* the will of the legislature, if that will has been clearly expressed." That the existence of foreign states cannot be known to this court judicially, except by some *act or recognition of the other departments of this government is, I think, fully established in the case of *United States* [*47 v. *Palmer*, 3 Wheat. 634-5 ; *The Divina Pastora*, 4 Ibid. 63; and *The Anna*, 6 Ibid. 193.

I shall resort to the same high authority as the basis of my opinion on the powers of the state governments. "By the revolution, the duties as well as the powers of government devolved on the people of (Georgia) New Hampshire. It is admitted, that among the latter were comprehended the transcendent powers of parliament, as well as those of the executive department." *Dartmouth College* v. *Woodward*, 4 Wheat. 651 ; 4 Ibid. 192 ; *Green* v. *Biddle*, 8 Ibid. 98 ; *Ogden* v. *Saunders*, 12 Ibid. 254, &c. " The same principle applies, though with no greater force, to the different states of America ; for though they form a confederated government, yet the several states retain their individual sovereignties, and with respect to their municipal regulations, are to each other foreign." *Buckner* v. *Findley*, 2 Pet. 591. The powers of government, which thus devolved on Georgia by the revolution, over her whole territory, are unimpaired by any surrender of her territorial jurisdiction, by the old confederation or the new constitution, as there was in both an express saving, as well as by the tenth article of amendments.

But if any passed to the United States by either, they were retroceded by the convention of 1802. Her jurisdiction over the territory in question is as supreme as that of congress, over what the nation has acquired by cession from the states, or treaties with foreign powers, combining the rights of the state and general government. Within her boundaries, there can be no other nation, community or sovereign power, which this department can judicially recognise as a foreign state, capable of demanding or claiming our interposition, so as to enable them to exercise a jurisdiction incompatible with a sovereignty in Georgia, which has been recognised by the constitution, and every department of this government acting under its authority. Foreign states cannot be created by judicial construction ; Indian sovereignty cannot be roused from its long slumber, and awakened

to action by our *fiat*. I find no acknowledgment of it by the legislative or executive power. *Until they have done so, I can stretch forth no arm for their relief, without violating the constitution. I say this with great deference to those from whom I dissent; but my judgment tells me, I have no power to act, and imperious duty compels me to stop at the portal, unless I can find some authority in the judgments of this court, to which I may surrender my own.

Indians have rights of occupancy to their lands, as sacred as the fee-simple, absolute title of the whites; but they are only rights of occupancy, incapable of alienation, or being held by any other than common right, without permission from the government. 8 Wheat. 592. In *Fletcher* v. *Peck*, this court decided, that the Indian occupancy was not absolutely repugnant to a seisin in fee in Georgia; that she had good right to grant land so occupied; that it was within the state, and could be held by purchasers under a law, subject only to extinguishment of the Indian title. 6 Cranch 88, 142; 9 Ibid. 11. In the case of *Johnson* v. *McIntosh*, 8 Wheat. 543, 571, the nature of the Indian title to lands on this continent, throughout its whole extent, was most ably and elaborately considered; leading to conclusions satisfactory to every jurist, clearly establishing that, from the time of discovery under the royal government, the colonies, the states, the confederacy and this Union, their tenure was the same occupancy, their rights occupancy, and nothing more; that the ultimate absolute fee, jurisdiction and sovereignty was in the government, subject only to such rights; that grants vested soil and dominion, and the powers of government, whether the land granted was vacant or occupied by Indians.

By the treaty of peace, the powers of government, and the rights of soil, which had previously been in Great Britain, passed definitively to these states. 8 Wheat. 584. They asserted these rights, and ceded soil and jurisdiction to the United States. The Indians were considered as tribes of fierce savages; a people with whom it was impossible to mix, and who could not be governed as a distinct society. They are not named or referred to in any part of the opinion of the court, as nations or states, and nowhere declared to have any national capacity or attributes of sovereignty, in their *relations to the general or state governments. The principles established in this case have been supposed to apply to the rights which the nations of Europe claimed to acquire by discovery, as only relative between themselves, and that they did not assume thereby any rights of soil or jurisdiction over the territory in the actual occupation of the Indians. But the language of the court is too explicit to be misunderstood. " This principle was, that discovery gave title to the government by whose subjects or by whose authority it was made, against all other European governments, which title might be consummated by possession." Those relations which were to subsist between the discoverer and the natives were to be regulated by themselves. The rights thus acquired being exclusive, no other power could interpose between them.

While the different nations of Europe respected the rights of the natives, as occupants, they asserted the ultimate dominion to be in themselves; and claimed and exercised, as a consequence of this ultimate dominion, a power to grant the soil, while yet in the possession of the natives. These grants have been understood by all, to convey a title to the grantees,

Cherokee Nation v. Georgia.

subject only to the Indian rights of occupancy. The history of America, from its discovery to the present day proves, we think, the universal recog nition of these principles. 8 Wheat. 574. I feel it my duty, to apply them to this case. They are in perfect accordance with those on which the gov- ernments of the united and individual states have acted in all their changes ; they were asserted and maintained by the colonies, before they assumed independence. While dependent themselves on the crown, they exercised all the rights of dominion and sovereignty over the territory occupied by the Indians ; and this is the first assertion by them of rights as a foreign state, within the limits of a state. If their jurisdiction within their bound- aries has been unquestioned, until this controversy ; if rights have been exercised, which are directly repugnant to those now claimed ; the judicial power cannot divest the states of rights of sovereignty, and transfer them to the Indians, by decreeing them to be a nation, or foreign state, pre-exist- ing and with rightful jurisdiction and sovereignty over the territory they occupy. This would reverse every principle on which our government have acted for fifty-five years ; and force, by *mere judicial power, upon [*50 the other departments of this government, and the states of this Union, the recognition of the existence of nations and states, within the limits of both, possessing dominion and jurisdiction paramount to the federal and state constitutions. It will be a declaration, in my deliberate judgment, that the sovereign power of the people of the United States and Union must hereafter remain incapable of action over territory to which their rights in full dominion have been asserted with the most rigorous authority, and bow to a jurisdiction hitherto unknown ; unacknowledged by any department of the government ; denied by all, through all time ; unclaimed till now ; and now declared to have been called into exercise, not by any change in our constitution, the laws of the Union or the states ; but pre-existent and paramount over the supreme law of the land.

I disclaim the assumption of a judicial power so awfully responsible. No assurance or certainty of support in public opinion can induce me to dis- regard a law so supreme ; so plain to my judgment and reason. Those who have brought public opinion to bear on this subject, act under a mere moral responsibility ; under no oath, which binds their movements to the straight and narrow line drawn by the constitution. Politics or philanthropy may impel them to pass it ; but when their objects can be effectuated only by this court, they must not expect its members to diverge from it, when they cannot conscientiously take the first step, without breaking all the high obligations under which they administer the judicial power of the constitu- tion. The account of my executorship cannot be settled before the court of public opinion, or any human tribunal. None can release the balance which will accrue by the violation of my solemn conviction of duty.

THOMPSON, Justice. (*Dissenting.*)—Entertaining different views of the questions now before us in this case, and having arrived at a conclusion different from that of a majority of the court, and considering the importance of the case and the constitutional principle involved in it ; I shall proceed, with all due respect for the opinion of others, to assign the reasons upon which my own has been formed.

In the opinion pronounced by the court, the merits of the *contro-   [*51
5 PET.—3   33

versy between the state of Geoegia and the Cherokee Indians have not been taken into consideration. The denial of the application for an injunction has been placed solely on the ground of want of jurisdiction in this court to grant the relief prayed for. It became, therefore, unnecessary to inquire into the merits of the case. But thinking as I do, that the court has jurisdiction of the case, and may grant relief, at least, in part; it may become necessary for me, in the course of my opinion, to glance at the merits of the controversy; which I shall, however, do very briefly, as it is important only so far as relates to the present application.

Before entering upon the examination of the particular points which have been made and argued, and for the purpose of guarding against any erroneous conclusions, it is proper that I should state, that I do not claim for this court, the exercise of jurisdiction upon any matter properly falling under the denomination of political power. Relief to the full extent prayed by the bill may be beyond the reach of this court. Much of the matter therein contained, by way of complaint, would seem to depend for relief upon the exercise of political power; and as such, appropriately devolving upon the executive, and not the judicial, department of the government. This court can grant relief so far only as the rights of person or property are drawn in question, and have been infringed.

It would very ill become the judicial station which I hold, to indulge in any remarks upon the hardship of the case, or the great injustice that would seem to have been done to the complainants, according to the statement in the bill, and which, for the purpose of the present motion, I must assume to be true. If they are entitled to other than judicial relief, it cannot be admitted, that in a government like ours, redress is not to be had in some of its departments; and the responsibility for its denial must rest upon those who have the power to grant it. But believing as I do, that relief to some extent falls properly under judicial cognisance, I shall proceed to the examination of the case under the following heads. 1. Is the Cherokee nation of Indians a competent party to sue in this court? 2. *Is a sufficient case made out in the bill, to warrant this court in granting any relief? 3. Is an injunction the fit and appropriate relief?

*52]

1. By the constitution of the United States it is declared (Art. 3, § 2), that the judicial power shall extend to all cases in law and equity, arising under this constitution, the laws of the United States, and treaties made or which shall be made under their authority, &c.; to controversies between two or more states, &c., and between a state or the citizens thereof, and foreign states, citizens or subjects. The controversy in the present case is alleged to be between a foreign state, and one of the states of the Union; and does not, therefore, come within the 11th amendment of the constitution, which declares that the judicial power of the United States shall not be construed to extend to any suit in law or equity commenced or prosecuted against one of the United States, by citizens of another state, or by citizens or subjects of any foreign state. This amendment does not, therefore, extend to suits prosecuted against one of the United States by a foreign state. The constitution further provides, that in all cases where a state shall be a party, the supreme court shall have original jurisdiction. Under these provisions in the constitution, the complainants have filed their bill in this court, in the character of a foreign state, against the state of Georgia;

Cherokee Nation v. Georgia.

praying an injunction to restrain that state from committing various alleged violations of the property of the nation, claimed under the laws of the United States, and treaties made with the Cherokee nation.

That a state of this Union may be sued by a foreign state, when a proper case exists and is presented, is too plainly and expressly declared in the constitution, to admit of doubt ; and the first inquiry is, whether the Cherokee nation is a foreign state, within the sense and meaning of the constitution. The terms state and nation are used in the law of nations, as well as in common parlance, as importing the same thing ; and imply a body of men, united together, to procure their mutual safety and advantage, by means of their union. Such a society has its affairs and interests to manage ; it deliberates, and takes resolutions in common, and thus becomes a moral *person, having an understanding and a will peculiar to itself, and is [*53 susceptible of obligations and laws. Vattel 1. Nations being composed of men naturally free and independent, and who, before the establishment of civil societies, live together in the state of nature, nations or sovereign states ; are to be considered as so many free persons, living together in a state of nature. Vattel 2, § 4. Every nation that governs itself, under what form soever, without any dependence on a foreign power, is a sovereign state. Its rights are naturally the same as those of any other state. Such are moral persons who live together in a natural society, under the law of nations. It is sufficient, if it be really sovereign and independent : that is, it must govern itself by its own authority and laws. We ought, therefore, to reckon in the number of sovereigns those states that have bound themselves to another more powerful, although by an unequal alliance. The conditions of these unequal alliances may be infinitely varied ; but whatever they are, provided the inferior ally reserves to itself the sovereignty or the right to govern its own body, it ought to be considered an independent state. Consequently, a weak state, that, in order to provide for its safety, places itself under the protection of a more powerful one, without stripping itself of the right of government and sovereignty, does not cease, on this account, to be placed among the sovereigns who acknowledge no other power. Tributary and feudatory states do not thereby cease to be sovereign and independent states, so long as self-government, and sovereign and independent authority, is left in the administration of the state. Vattel, c. 1, pp. 16, 17.

Testing the character and condition of the Cherokee Indians by these rules, it not perceived how it is possible to escape the conclusion, that they form a sovereign state. They have always been dealt with as such by the goverment of the United States; both before and since the adoption of the present constitution. They have been admitted and treated as a people governed solely and exclusively by their own laws, usages, and customs, within their own territory, claiming and exercising exclusive dominion over the same ; yielding up by treaty, from time to time, portions of their land, but still claiming absolute sovereignty and self-government over what remained unsold. *And this has been the light in which [*54 they have, until recently, been considered, from the earliest settlement of the country, by the white people. And indeed, I do not understand, that it is denied by a majority of the court, that the Cherokee Indians form a sovereign state, according to the doctrine of the law of nations ;

but that, although a sovereign state, they are not considered a foreign state, within the meaning of the constitution.

Whether the Cherokee Indians are to be considered a foreign state or not, is a point on which we cannot expect to discover much light from the law of nations. We must derive this knowledge chiefly from the practice of our own government, and the light in which the nation has been viewed and treated by it. That numerous tribes of Indians, and among others the Cherokee nation, occupied many parts of this country, long before the discovery by Europeans, is abundantly established by history; and it is not denied, but that the Cherokee nation occupied the territory now claimed by them, long before that period. It does not fall within the scope and object of the present inquiry, to go into a critical examination of the nature and extent of the rights growing out of such occupancy, or the justice and humanity with which the Indians have been treated, or their rights respected. That they are entitled to such occupancy, so long as they choose quietly and peaceably to remain upon the land, cannot be questioned. The circumstance of their original occupancy is here referred to, merely for the purpose of showing, that if these Indian communities were then, as they certainly were, nations, they must have been foreign nations, to all the world ; not having any connection, or alliance of any description, with any other power on earth. And if the Cherokees were then a foreign nation ; when or how have they lost that character, and ceased to be a distinct people, and become incorporated with any other community ?

They have never been, by conquest, reduced to the situation of subjects to any conqueror. and thereby lost their separate national existence, and the rights of self-government, and become subject to the laws of the conqueror. Whenever wars have taken place, they have been followed *55]  by regular treaties of peace, containing stipulations on each side, according *to existing circumstances; the Indian nation always preserving its distinct and separate national character. And notwithstanding we do not recognise the right of the Indians to transfer the absolute title of their lands to any other than ourselves, the right of occupancy is still admitted to remain in them, accompanied with the right of self-government, according to their own usages and customs ; and with the competency to act in a national capacity, although placed under the protection of the whites, and owing a qualified subjection, so far as is requisite for public safety. But the principle is universally admitted, that this occupancy belongs to them as a matter of right, and not by mere indulgence. They cannot be disturbed in the enjoyment of it, or deprived of it, without their free consent ; or unless a just and necessary war should sanction their dispossession.

In this view of their situation, there is as full and complete recognition of their sovereignty, as if they were the absolute owners of the soil. The progress made in civilization by the Cherokee Indians cannot surely be considered as in any measure destroying their national or foreign character, so long as they are permitted to maintain a separate and distinct government ; it is their political condition that constitutes their foreign character, and in that sense must the term foreign be understood, as used in the constitution. It can have no relation to local, geographical or territorial position. It cannot mean a country beyond sea. Mexico or Canada is certainly to be

considered a foreign country, in reference to the United States. It is the political relation in which one government or country stands to another, which constitutes it foreign to the other. The Cherokee territory being within the chartered limits of Georgia, does not affect the question. When Georgia is spoken of as a state, reference is had to its political character, and not to boundary; and it is not perceived, that any absurdity or inconsistency grows out of the circumstance, that the jurisdiction and territory of the state of Georgia surround or extend on every side of the Cherokee territory. It may be inconvenient to the state, and very desirable, that the Cherokees should be removed; but it does not at all affect the political relation between Georgia and those Indians. Suppose, the *Cherokee territory had been occupied by Spaniards, or any other civilized people, instead of [*56 Indians, and they had, from time to time, ceded to the United States portions of their lands, precisely in the same manner as the Indians have done, and in like manner, retained and occupied the part now held by the Cherokees, and having a regular government established there; would it not only be considered a separate and distinct nation or state, but a foreign nation, with reference to the state of Georgia or the United States? If we look to lexicographers, as well as approved writers, for the use of the term foreign, it may be applied with the strictest propriety to the Cherokee nation. In a general sense, it is applied to any person or thing belonging to another nation or country. We call an alien a foreigner, because he is not of the country in which we reside. In a political sense, we call every country foreign, which is not within the jurisdiction of the same government. In this sense, Scotland, before the Union, was foreign to England; and Canada and Mexico, foreign to the United States. In the United States, all transatlantic countries are foreign to us.

But this is not the only sense in which it is used. It is applied, with equal propriety, to an adjacent territory, as to one more remote. Canada or Mexico is as much foreign to us, as England or Spain. And it may be laid down as a general rule, that when used in relation to countries, in a political sense, it refers to the jurisdiction or government of the country. In a commercial sense, we call all goods coming from any country, not within our own jurisdiction, foreign goods. In the diplomatic use of the term, we call every minister a foreign minister, who comes from another jurisdiction or government. And this is the sense in which it is judicially used by this court, even as between the different states of this Union. In the case of *Buckner* v. *Finley*, 2 Pet. 590, it was held, that a bill of exchange, drawn in one state of the Union, on a person living in another state, was a foreign bill, and to be treated as such in the courts of the United States. The court says, that in applying the definition of a foreign bill, to the political character of the several states of this Union, in relation to each other, we are all clearly of opinion, *that bills drawn in one of these states upon persons living in another of them, partake of the character of foreign [*57 bills, and ought to be so treated. That, for all national purposes embraced by the federal constitution, the states and the citizens thereof are one; united under the same sovereign authority, and governed by the same laws. In all other respects, the states are necessarily foreign to, and independent of, each other; their constitutions and forms of government being, although republican, altogether different, as are their laws and institutions. So, in

the case of *Warder* v. *Arell,* decided in the court of appeals of Virginia, 2 Wash. 298, the court, in speaking of foreign contracts, and saying that the laws of the foreign country where the contract was made must govern, add, the same principle applies, though with no greater force, to the different states of America ; for though they form a confederated government, yet the several states retain their individual sovereignty ; and, with respect to their municipal regulations, are to each other foreign.

It is manifest from these cases, that a foreign state, judicially considered, consists in its being under a different jurisdiction or government, without any reference to its territorial position. This is the marked distinction, particularly in the case of *Buckner* v. *Finley.* So far as these states are subject to the laws of the Union, they are not foreign to each other. But so far as they are subject to their own respective state laws and government, they are foreign to each other. And if, as here decided, a separate and distinct jurisdiction or government is the test by which to decide whether a nation be foreign or not, I am unable to perceive any sound and substantial reason why the Cherokee nation should not be so considered. It is governed by its own laws, usages and customs ; it has no connection with any other government or jurisdiction, except by way of treaties entered into with like form and ceremony as with other foreign nations. And this seems to be the view taken of them by Mr. Justice JOHNSON in the case of *Fletcher* v. *Peck,* 6 Cranch 146. In speaking of the state and condition of the different Indian nations, he observes, "that some have totally extinguished their national fire, and submitted themselves to the laws of the states ; others have by treaty acknowledged that they hold *their national existence *58]   at the will of the state, within which they reside ; others retain a limited sovereignty, and the absolute proprietorship of their soil. The latter is the case of the tribes to the west of Georgia, among which are the Cherokees. We legislate upon the conduct of strangers or citizens within their limits, but innumerable treaties formed with them, acknowledge them to be an independent people ; and the uniform practice of acknowledging their right of soil, by purchasing from them, and restraining all persons from encroaching upon their territory, makes it unnecessary to insist upon their rights of soil."

Although there are many cases in which one of these United States has been sued by another, I am not aware of any instance in which one of the United States has been sued by a foreign state. But no doubt can be entertained, that such an action might be sustained, upon a proper case being presented. It is expressly provided for in the constitution ; and this provision is certainly not to be rejected as entirely nugatory. Suppose, a state, with the consent of congress, should enter into an agreement with a foreign power (as might undoubtedly be done, Constitution, Art. 1, § 10), for a loan of money ; would not an action be sustained in this court to enforce payment thereof ? Or suppose, the state of Georgia, with the consent of congress, should purchase the right of the Cherokee Indians to this territory, and enter into a contract for the payment of the purchase-money ; could there be a doubt, that an action could be sustained upon such a contract ? No objection would certainly be made for want of competency in that nation to make a valid contract. The numerous treaties entered into with the nation would be a conclusive answer to any such objection. And if an action could

Cherokee Nation v. Georgia.

be sustained in such case, it must be under that provision in the constitution which gives jurisdiction to this court in controversies between a state and a foreign state.   For the Cherokee nation is certainly not one of the United States.

And what possible objection can lie to the right of the complainants to sustain an action ?   The treaties made with this nation purport to secure to it certain rights.   These are not gratuitous obligations assumed on the part of the United States.   They are obligations founded upon a consideration paid by the *Indians, by cession of part of their territory.   And   [*59 if they, as a nation, are competent to make a treaty or contract, it would seem to me, to be a strange inconsistency, to deny to them the right and the power to enforce such a contract.   And where the right secured by such a treaty forms a proper subject for judicial cognisance, I can perceive no reason why this court has not jurisdiction of the case.   The constitution expressly gives to the court jurisdiction, in all cases of law and equity arising under treaties made with the United States.   No suit will lie against the United States, upon such treaty, because no possible case can exist, where the United States can be sued.   But not so with respect to a state : and if any right secured by treaty has been violated by a state, in a case proper for judicial inquiry, no good reason is perceived, why an action may not be sustained for violation of a right secured by treaty, as well as by contract under any other form.   The judiciary is certainly not the department of the government authorized to enforce all rights that may be recognised and secured by treaty.   In many instances, these are mere political rights with which the judiciary cannot deal.   But when the question relates to a mere right of property, and a proper case can be made between competent parties, it forms a proper subject for judicial inquiry.

It is a rule, which has been repeatedly sanctioned by this court, that the judicial department is to consider as sovereign and independent states or nations, those powers that are recognised as such by the executive and legislative departments of the government ; they being more particularly intrusted with our foreign relations.   4 Cranch 241 ; 3 Wheat. 634 ; 4 Ibid. 64.   If we look to the whole course of treatment by this country of the Indians, from the year 1775, to the present day, when dealing with them in their aggregate capacity as nations or tribes, and regarding the mode and manner in which all negotiations have been carried on and concluded with them ; the conclusion appears to me irresistible, that they have been regarded, by the executive and legislative branches of the government, not only as sovereign and independent, but as foreign nations or tribes, not within the jurisdiction, nor under the government of the states within which they were located.   This remark is to be *understood, of course, as   [*60 referring only to such as live together as a distinct community, under their own laws, usages and customs ; and not to the mere remnant of tribes which are to be found in many parts of our country, who have become mixed with the general population of the country ; their national character extinguished, and their usages and customs in a great measure abandoned ; self government surrendered ; and who have, voluntarily, or by the force of circumstances which surround them, gradually become subject to the laws of the states within which they are situated.   Such, however, is not the case with the Cherokee nation.   It retains its usages and customs and self-

government, greatly improved by the civilization which it has been the policy of the United States to encourage and foster among them. All negotiations carried on with the Cherokees and other Indian nations have been by way of treaty, with all the formality attending the making of treaties with any foreign power. The journals of congress, from the year 1775, down to the adoption of the present constitution, abundantly establish this fact. And since that period, such negotiations have been carried on by the treaty-making power, and uniformly under the denomination of treaties.

What is a treaty, as understood in the law of nations? It is an agreement or contract between two or more nations or sovereigns, entered into by agents appointed for that purpose, and duly sanctioned by the supreme power of the respective parties. And where is the authority, either in the constitution, or in the practice of the government, for making any distinction between treaties made with the Indian nations, and any other foreign power? They relate to peace and war; the surrender of prisoners; the cession of territory; and the various subjects which are usually embraced in such contracts between sovereign nations.

A recurrence to the various treaties made with the Indian nations and tribes, in different parts of the country, will fully illustrate this view of the relation in which our government has considered the Indians as standing. It will be sufficient, however, to notice a few of the many treaties made with this Cherokee nation. By the treaty of Hopewell, of the 28th of November 1785 *(1 Laws U. S. 322), mutual stipulations are entered into, to *61] restore all prisoners taken by either party, and the Cherokees stipulate to restore all negroes and all other property taken from the citizens of the United States; and a boundary line is settled between the Cherokees and the citizens of the United States, and this embraced territory within the chartered limits of Georgia. And by the sixth article, it is provided, that if any Indian, or person residing among them, or who shall take refuge in their nation, shall commit a robbery or murder, or other capital crime, on any citizen of the United States, or person under their protection, the nation or tribe to which such offender may belong, shall deliver him up, to be punished according to the ordinances of the United States. What more explicit recognition of the sovereignty and independence of this nation could have been made? It was a direct acknowledgment, that this territory was under a foreign jurisdiction. If it had been understood, that the jurisdiction of the state of Georgia extended over this territory, no such stipulation would have been necessary. The process of the courts of Georgia would have run into this, as well as into any other part of the state. It is a stipulation analogous to that contained in the treaty of 1794 with England, (8 U. S. Stat. 129), by the 27th article of which it is mutually agreed, that each party will deliver up to justice all persons, who, being charged with murder or forgery, committed within the jurisdiction of either, shall seek an asylum within any of the countries of the other. Upon what ground can any distinction be made, as to the reason and necessity of such stipulation, in the respective treaties? The necessity for the stipulation in both cases must be, because the process of one government and jurisdiction will not run into that of another; and separate and distinct jurisdiction, as has been

shown, is what makes governments and nations foreign to each other in their political relations.

The same stipulation, as to delivering up criminals who shall take refuge in the Cherokee nation, is contained in the treaty of Holston, of the 2d of July 1791. (7 U. S. Stat. 39.) And the 11th article fully recognises the jurisdiction of the Cherokee nation over the territory occupied by them. It provides, that if any citizen of the United States shall go into *the [*62 territory belonging to the Cherokees, and commit any crime upon, or trespass against, the person or property of any friendly Indian, which, if committed within the jurisdiction of any state, would be punishable by the laws of such state, shall be subject to the same punishment, and proceeded against in the same manner, as if the offence had been committed within the jurisdiction of the state. Here is an explicit admission that the Cherokee territory is not within the jurisdiction of any state. If it had been considered within the jurisdiction of Georgia, such a provision would not only be unnecessary but absurd. It is a provision looking to the punishment of a citizen of the United States, for some act done in a foreign country. If exercising exclusive jurisdiction over a country is sufficient to constitute the state or power so exercising it, a foreign state, the Cherokee nation may assuredly, with the greatest propriety, be so considered.

The phraseology of the clause in the constitution, giving to congress the power to regulate commerce, is supposed to afford an argument against considering the Cherokees a foreign nation. The clause reads thus, " to regulate commerce with foreign nations, and among the several states, and with the Indian tribes." (Constitution, Art. 1, § 8.) The argument is, that if the Indian tribes are foreign nations, they would have been included, without being specially named, and being so named, imports something different from the previous term " foreign nations." This appears to me to partake too much of a mere verbal criticism, to draw after it the important conclusion, that Indian tribes are not foreign nations. But the clause affords, irresistibly, the conclusion, that the Indian tribes are not there understood as included within the description of, the " several states ; " or there could have been no fitness in immediately thereafter particularizing " the Indian tribes." It is generally understood, that every separate body of Indians is divided into bands or tribes, and forms a little community within the nation to which it belongs ; and as the nation has some particular symbol, by which it is distinguished from others, so each tribe has a badge from which it is denominated, and each tribe may have rights applicable to itself. Cases may arise, where the trade with a particular tribe may *require [*63 to be regulated, and which might not have been embraced under the general description of the term nation, or it might at least have left the case somewhat doubtful ; as the clause was intended to vest in congress the power to regulate all commercial intercourse, this phraseology was probably adopted to meet all possible cases ; and the provision would have been imperfect, if the term Indian tribes had been omitted. Congress could not then, have regulated the trade with any particular tribe that did not extend to the whole nation. Or, it may be, that the term tribe is here used as importing the same thing as that of nation, and adopted merely to avoid the repetition of the term nation : and the Indians are specially named, because there was a provision somewhat analogous in the confederation ;

and entirely omitting to name the Indian tribes, might have afforded some plausible grounds for concluding that this branch of commercial intercourse was not subject to the power of congress.

On examining the journals of the old congress, which contain numerous proceedings and resolutions respecting the Indians, the terms " nation " and " tribe " are frequently used indiscriminately, and as importing the same thing ; and treaties were sometimes entered into with the Indians, under the description or denomination of tribes, without naming the nation.   See Journals 30th June and 12th of July 1775 ; 8th March 1776 ; 20th October 1777 ; and numerous other instances.

But whether any of these suggestions will satisfactorily account for the phraseology here used, or not, it appears to me, to be of too doubtful import, to outweigh the considerations to which I have referred, to show that the Cherokees are a foreign nation.   The difference between the provision in the constitution and that in the confederation on this subject, appears to me, to show very satisfactorily, that so far as related to trade and commerce with the Indians, wherever found in tribes, whether within or without the limits of a state, was subject to the regulation of congress. The provision in the confederation, Art. 9 (1 U. S. Stat. 7), is, that congress shall have the power of regulating the trade and management of all affairs with the Indians, not members of any of the states, provided that the legislative right of any state within its own limits be not infringed or violated.

*64]   *The true import of this provision is certainly not very obvious : see Federalist, No. 42.   What were the legislative rights intended to be embraced within the proviso, is left in great uncertainty.   But whatever difficulty on that subject might have arisen, under the confederation, it is entirely removed, by the omission of the proviso in the present constitution ; thereby leaving this power entirely with congress, without regard to any state right on the subject ; and showing that the Indian tribes were considered as distinct communities, although within the limits of a state.

The provision, as contained in the confederation, may aid in illustrating what is to be inferred from some parts of the constitution (Art. 1, § 1, par. 3), as to the apportionment of representatives, and acts of congress in relation to the Indians, to wit, that they are divided into two distinct classes. One composed of those who are considered members of the state within which they reside, and the other not : the former embracing the remnant of the tribes who had lost their distinctive character as a separate community, and had become subject to the laws of the states ; and the latter, such as still retained their original connection as tribes, and live together under their own laws, usages and customs, and, as such, are treated as a community independent of the state.   No very important conclusion, I think, therefore, can be drawn from the use of the term " tribe," in this clause of the constitution, intended merely for commercial regulations.   If considered as importing the same thing as the term " nation," it might have been adopted, to avoid the repetition of the word nation.

Other instances occur in the constitution, where different terms are used, importing the same thing.   Thus, in the clause giving jurisdiction to this court, the term " foreign states" is used, instead of " foreign nations," as in the clause relating to commerce.   And again, in Art. 1, § 10, a still different phraseology is employed.   " No state, without the consent of

Cherokee Nation v. Georgia.

congress, shall enter into any agreement or compact with a 'foreign power.'" But each of these terms, nation, state, power, as used in different parts of the constitution, imports the same thing, and does not admit of a different interpretation. In the treaties made with the Indians, they are sometimes designated under the name of tribe, and sometimes that *of nation. In the treaty of 1804, with the Delaware Indians, they [*65 are denominated the "Delaware tribe of Indians." (7 U. S. Stat. 81.) And in a previous treaty with the same people, in the year 1778, they are designated by the name of "the Delaware nation." (Ibid. 13.)

As this was one of the earliest treaties made with the Indians, its provisions may serve to show in what light the Indian nations were viewed by congress at that day. The territory of the Delaware nation was within the limits of the states of New York, Pennsylvania and New Jersey. Yet we hear of no claim of jurisdiction set up by those states over these Indians. This treaty, both in form and substance, purports to be an arrangement with an independent sovereign power. It even purports to be articles of confederation. It contains stipulations relative to peace and war, and for permission to the United States troops to pass through the country of the Delaware nation. That neither party shall protect, in their respective states, servants, slaves or criminals, fugitives from the other; but secure and deliver them up. Trade is regulated between the parties. And the sixth article shows the early pledge of the United States to protect the Indians in their possessions, against any claims or encroachments of the states. It recites, that whereas, the enemies of the United States have endeavored to impress the Indians in general with an opinion, that it is the design of the states to extirpate the Indians, and take possession of their country; to obviate such false suggestions, the United States do engage to guaranty to the aforesaid nation of Delawares and their heirs, all their territorial rights, in the fullest and most ample manner, as it has been bounded by former treaties, &c. And provision is even made for inviting other tribes to join the confederacy; and to form a state, and have a representation in congress, should it be found conducive to the mutual interest of both parties. All which provisions are totally inconsistent with the idea of these Indians being considered under the jurisdiction of the states, although their chartered limits might extend over them. The recital, in this treaty, contains a declaration and admission of congress of the rights of Indians in general; and that the impression which our enemies were *endeavor- [*66 ing to make, that it was the design of the states to extirpate them, and take their lands, was false. And the same recognition of their rights runs through all the treaties made with the Indian nations or tribes, from that day down to the present time.

The twelfth article of the treaty of Hopewell contains a full recognition of the sovereign and independent character of the Cherokee nation. To impress upon them full confidence in the justice of the United States respecting their interest, they have a right to send a deputy of their choice to congress. No one can suppose, that such deputy was to take his seat as a member of congress, but that he would be received as the agent of that nation. It is immaterial, what such agent is called, whether minister, commissioner or deputy; he is to represent his principal. There could have been no fitness or propriety in any such stipulation, if the Cherokee nation

43

had been considered in any way incorporated with the state of Georgia, or as citizens of that state. The idea of the Cherokees being considered citizens, is entirely inconsistent with several of our treaties with them. By the eighth article of the treaty of the 26th December 1817 (7 U. S. Stat. 159), the United States stipulate to give 640 acres of land to each head of any Indian family residing on the lands now ceded, or which may hereafter be surrendered, to the United States, who may wish to become citizens of the United States; so also, the second article of the treaty with the same nation, of the 10th of March 1819, contains the same stipulation in favor of the heads of families, who may choose to become citizens of the United States; thereby clearly showing that they were not considered citizens, at the time those stipulations were entered into, or the provision would have been entirely unnecessary, if not absurd. And if not citizens, they must be aliens or foreigners, and such must be the character of each individual belonging to the nation. And it was, therefore, very aptly asked, on the argument, and I think not very easily answered, how a nation composed of aliens or foreigners can be other than a foreign nation.

The question touching the citizenship of an Oneida Indian came under *67]  the consideration of the supreme court of New *York in the case of *Jackson* v. *Goodell*, 20 Johns. 193. The lessor of the plaintiff was the son of an Oneida Indian, who had received a patent for the lands in question, as an officer in the revolutionary war; and although the supreme court, under the circumstances of the case, decided he was a citizen, yet Chief Justice SPENCER observed, we do not mean to say, that the condition of the Indian tribes (alluding to the Six Nations), at former and remote periods, has been that of subjects or citizens of the state; their condition has been gradually changing, until they have lost every attribute of sovereignty, and become entirely dependent upon, and subject to, our government. But the cause being carried up to the court of errors, Chancellor KENT, in a very elaborate and able opinion on that question, came to a different conclusion as to the citizenship of the Indian, even under the strong circumstances of that case.

" The Oneidas," he observed, and " the tribes composing the Six Nations of Indians, were originally free and independent nations, and it is for the counsel who contend that they have now ceased to be a distinct people, and become completely incorporated with us, to point out the time when that event took place. In my view, they have never been regarded as citizens, or members of our body politic. They have always been, and still are, considered by our laws, as dependent tribes, governed by their own usages and chiefs; but placed under our protection, and subject to our coercion so far as the public safety required it, and no further. The whites have been gradually pressing upon them, as they kept receding from the approaches of civilization. We have purchased the greater part of their lands, destroyed their hunting-grounds, subdued the wilderness around them, overwhelmed them with our population, and gradually abridged their native independence. Still, they are permitted to exist as distinct nations, and we continue to treat with their sachems in a national capacity, and as being the lawful representatives of their tribes. Through the whole course of our colonial history, these Indians were considered dependent allies. The colonial authorities uniformly negotiated with them, and made and observed treaties

with them, as sovereign communities exercising the right of free deliberation and action ; but, in consideration of protection, owing *a qualified subjection, in a national capacity, to the British crown.  No argument [\*68 can be drawn against the sovereignty of these Indian nations, from the fact of their having put themselves and their lands under the protection of the British crown ; such a fact is of frequent occurrence between independent nations.  One community may be bound to another by a very unequal alliance, and still be a sovereign state.  Vattel, lib. 1, c. 16, § 194. The Indians, though born within our territorial limits, are considered as born under the dominion of their own tribes.  There is nothing in the proceedings of the United States, during the revolutionary war, which went to impair, and much less to extinguish, the national character of the Six Nations, and consolidate them with our own people.  Every public document speaks a different language, and admits their distinct existence and competence as nations ; but placed in the same state of dependence, and calling for the same protection, which existed before the war.  In the treaties made with them, we have the forms and requisites peculiar to the intercourse between friendly and independent states ; and they are conformable to the received institutes of the law of nations.  What more demonstrable proof can we require, of existing and acknowledged sovereignty ? "

If this be a just view of the Oneida Indians, the rules and principles here applied to that nation may, with much greater force, be applied to the character, state and condition of the Cherokee nation of Indians ; and we may safely conclude, that they are not citizens, and must, of course, be aliens : and if aliens in their individual capacities, it will be difficult to escape the conclusion, that, as a community, they constitute a foreign nation or state, and thereby become a competent party to maintain an action in this court, according to the express terms of the constitution.

And why should this court scruple to consider this nation a competent party to appear here ?  Other departments of the government, whose right it is to decide what powers shall be recognised as sovereign and independent nations, have treated this nation as such.  They have considered it competent, in its political and national capacity, to enter into contracts of the most solemn character ; and if these contracts contain matter proper for judicial inquiry, *why should we refuse to entertain jurisdiction of the case ?  Such jurisdiction is expressly given to this court, in cases [\*69 arising under treaties.  If the executive department does not think proper to enter into treaties or contracts with the Indian nations, no case with them can arise calling for judicial cognisance.  But when such treaties are found, containing stipulations proper for judicial cognisance, I am unable to discover any reasons satisfying my mind that this court has not jurisdiction of the case.

The next inquiry is, whether such a case is made out in the bill, as to warrant this court in granting any relief ?  I have endeavored to show, that the Cherokee nation is a foreign state ; and as such, a competent party to maintain an original suit in this court against one of the United States. The injuries complained of are violations committed and threatened upon the property of the complainants, secured to them by the laws and treaties of the United States.  Under the constitution, the judicial power of the United States extends expressly to all cases in law and equity, arising under

the laws of the United States, and treaties made or which shall be made, under the authority of the same.

In the case of *Osborn* v. *United States Bank*, 9 Wheat. 819, the court say, that this clause in the constitution enables the judicial department to receive jurisdiction to the full extent of the constitution, laws and treaties of the United States, when any question respecting them shall assume such a form that the judicial power is capable of acting on it. That power is capable of acting only when the subject is submitted to it by a party who asserts his rights in the form presented by law. It then becomes a case, and the constitution authorizes the application of the judicial power. The question presented in the present case is, under the ordinary form of judicial proceedings, to obtain an injunction to prevent or stay a violation of the rights of property claimed and held by the complainants, under the treaties and laws of the United States ; which, it is alleged, have been violated by the state of Georgia. Both the form and the subject-matter of the complaint, therefore, fall properly under judicial cognisance.

*70]    What the rights of property in the Cherokee nation are, *may be discovered from the several treaties which have been made between the United States and that nation, between the years 1785 and 1819. It will be unnecessary to notice many of them. They all recognise, in the most unqualified manner, a right of property in this nation, to the occupancy, at least, of the lands in question. It is immaterial, whether this interest is a mere right of occupancy, or an absolute right of the soil. The complaint is for a violation, or threatened violation, of the possessory right. And this is a right, in the enjoyment of which they are entitled to protection, according to the doctrine of this court in the cases of *Fletcher* v. *Peck*, 6 Cranch 87, and *Johnson* v. *McIntosh*, 8 Wheat. 592. By the fourth article of the treaty of Hopewell, as early as the year 1785 (7 U. S. Stat. 18), the boundary line between the Cherokees and the citizens of the United States within the limits of the United States is fixed. The fifth article provides for the removal and punishment of citizens of the United States, or other persons, not being Indians, who shall attempt to settle on the lands so allotted to the Indians ; thereby not only surrendering the exclusive possession of these lands to this nation, but providing for the protection and enjoyment of such possession. And it may be remarked, in corroboration of what has been said in a former part of this opinion, that there is here drawn a marked line of distinction between the Indians and citizens of the United States ; entirely excluding the former from the character of citizens.

Again, by the treaty of Holston, in 1791 (7 U. S. Stat. 39), the United States purchase a part of the territory of this nation, and a new boundary line is designated, and provision made for having it ascertained and marked. The mere act of purchasing and paying a consideration for these lands, is a recognition of the Indian right. In addition to which, the United States, by the seventh article, solemnly guaranty to the Cherokee nation, all their lands not ceded by that treaty. And by the eighth article, it is declared, that any citizens of the United States, who shall settle upon any of the Cherokee lands, shall forfeit the protection of the United States ; and the

*71]    Cherokees may punish them or not as they shall please. *This treaty was made soon after the adoption of the present constitution. And in the last article, it is declared, that it shall take effect, and be obligatory

Cherokee Nation v. Georgia.

upon the contracting parties, as soon as the same shall have been ratified by the president of the United States, with the advice and consent of the senate ; thereby showing the early opinion of the government of the charac- ter of the Cherokee nation. The contract is made by way of treaty, and to be ratified in the same manner as all other treaties made with sovereign and independent nations ; and which has been the mode of negotiating in all subsequent Indian treaties. And this course was adopted by President Washington, upon great consideration, by and with the previous advice and concurrence of the senate. In his message sent to the senate on that occasion, he states, that the white people had intruded on the Indian lands, as bounded by the treaty of Hopewell, and declares his determination to execute the power intrusted to him by the constitution to carry that into faithful execution ; unless a new boundary should be arranged with the Cherokees, embracing the intrusive settlements, and compensating the Cherokees therefor. And he puts to the senate this question : shall the United States stipulate solemnly to guaranty the new boundary which shall be arranged ? Upon which, the senate resolve, that in case a new, or other boundary than that stipulated by the treaty of Hopewell shall be concluded with the Cherokee Indians, the senate do advise and consent solemnly to guaranty the same. (1 Executive Journal, 60.) In consequence of which, the treaty of Holston was entered into, containing the guaranty.

Further cessions of land have been made at different times, by the Cherokee nation to the United States, for a consideration paid therefor ; and, as the treaties declare, in acknowledgment for the protection of the United States (see treaty of 1798, 7 U. S. Stat. 62), the United States always recognising, in the fullest manner, the Indian right of possession: and in the treaty of the 8th of July, 1817, art, 5 (Ibid. 156), all former treaties are declared to be in full force ; and the sanction of the United States is given to the proposition of a portion of the nation, to begin the establishment of fixed laws and a regular government ; thereby recognising in the nation a political existence, capable of forming an* independent govern-    [*72 ment separate and distinct from, and in no manner whatever under the jurisdiction of, the state of Georgia ; and no objection is known to have been made by that state. And again, in 1819 (7 U. S. Stat. 195), another treaty is made, sanctioning and carrying into effect the measures contemplated by the treaty of 1817; beginning with a recital that the greater part of the Cherokees have expressed an earnest desire to remain on this side of the Mississippi, and being desirous, in order to commence those measures which they deem necessary to the civilization and preservation of their nation, that the treaty between the United States and them, of the 8th of July 1817, might, without further delay, be finally adjusted, have offered to make a further cession of land, &c. This cession is accepted, and various stipulations entered into, with a view to their civilization, and the establishment of a regular government, which has since been accomplished. And by the fifth article, it is stipulated, that all white people who have intruded, or who shall thereafter intrude, on the lands reserved for the Cherokees, shall be removed by the United States, and proceeded against according to the provisions of the act of 1802, entitled "an act to regulate trade and intercourse with the Indian tribes, and to preserve peace on the frontiers." (2 U. S. Stat. 139.) By this act, the boundary

lines, established by treaty with the various Indian tribes, are required to be ascertained and marked ; and among others, that with the Cherokee nation, according to the treaty of the 2d of October 1798.

It may be necessary here briefly to notice some of the provisions of this act of 1802, so far as it goes to protect the rights of property in the Indians ; for the purpose of seeing whether there has been any violation of those rights by the state of Georgia, which falls properly under judicial cognisance. By this act, it is made an offence, punishable by fine and imprisonment, for any citizen, or other person resident in the United States, or either of the territorial districts, to cross over or go within the boundary line, to hunt or destroy the game, or drive stock to range or feed on the Indian lands, or to go into any country allotted to the Indians, without a passport, or to commit therein any robbery, larceny, trespass, or other crime, against the person or property of any friendly *Indian, which would be punishable, if committed within the jurisdiction of any state, against a citizen of the United States ; thereby necessarily implying that the Indian territory secured by treaty was not within the jurisdiction of any state. The act further provides, that when property is taken or destroyed, the offender shall forfeit and pay twice the value of the property so taken or destroyed. And by the fifth section, it is declared, that if any citizen of the United States, or other person, shall make a settlement on any lands belonging, or secured or guarantied, by treaty with the United States, to any Indian tribe ; or shall survey or attempt to survey, such lands, or designate any of the boundaries, by marking trees or otherwise ; such offender shall forfeit a sum not exceeding $1000 and suffer imprisonment not exceeding twelve months. This act contains various other provisions for the purpose of protecting the Indians in the free and uninterrupted enjoyment of their lands ; and authority is given (§ 16) to employ the military force of the United States to apprehend all persons who shall be found in the Indian country, in violation of any of the provisions of the act ; and deliver them up to the civil authority, to be proceeded against in due course of law.

It may not be improper here to notice some diversity of opinion that has been entertained with respect to the construction of the 19th section of this act, which declares, that nothing therein contained shall be construed to prevent any trade or intercourse with the Indians, living on lands surrounded by settlements of citizens of the United States, and being within the ordinary jurisdiction of any of the individual states. It is understood, that the state of Georgia contends, that the Cherokee nation come within this section, and are subject to the jurisdiction of that state. Such a construction makes the act inconsistent with itself, and directly repugnant to the various treaties entered into between the United States and the Cherokee Indians. The act recognises and adopts the boundary line as settled by treaty. And by these treaties, which are in full force, the United States solemnly guaranty to the Cherokee nation all their lands, not ceded to the United States ; and these lands lie within the chartered limits of Georgia : and this was a subsisting guarantee, under the *treaty of 1791, when the act of 1802 was passed. It would require the most unequivocal language to authorize a construction so directly repugnant to these treaties. But this section admits of a plain and obvious interpretation, consistent with other parts of the act, and in harmony with these treaties. The reference

48

undoubtedly is, to that class of Indians which has already been referred to, consisting of the mere remnants of tribes, which have become almost extinct, and who have, in a great measure, lost their original character, and abandoned their usages and customs, and become subject to the laws of the state, although, in many parts of the country, living together, and surrounded by the whites. They cannot be said to have any distinct government of their own, and are within the ordinary jurisdiction and government of the state where they are located.

But such was not the condition and character of the Cherokee nation, in any respect whatever, in the year 1802, nor at any time since. It was a numerous and distinct nation, living under the government of their own laws, usages and customs, and in no sense under the ordinary jurisdiction of the state of Georgia ; but under the protection of the United States, with a solemn guarantee by treaty of the exclusive right to the possession of their lands. This guarantee is to the Cherokees in their national capacity. Their land is held in common, and every invasion of their possessory right is an injury done to the nation, and not to any individual. No private or individual suit could be sustained : the injury done being to the nation, the remedy sought must be in the name of the nation. All the rights secured to these Indians, under any treaties made with them, remain unimpaired. These treaties are acknowledged by the United States to be in full force, by the proviso to the 7th section of the act of the 28th of May 1830, which declares, that nothing in this act contained shall be construed as authorizing or directing the violation of any existing treaty between the United States and any Indian tribes.

That the Cherokee nation of Indians have, by virtue of these treaties, an exclusive right of occupancy of the lands in question, and that the United States are bound, under their guarantee, to protect the nation in the enjoyment of such *occupancy, cannot, in my judgment, admit of a doubt ; [*75 and that some of the laws of Georgia set out in the bill are in violation of, and in conflict with, those treaties, and the act of 1802, is, to my mind, equally clear. But a majority of the court having refused the injunction, so that no relief whatever can be granted, it would be a fruitless inquiry for me to go at large into an examination of the extent to which relief might be granted by this court, according to my own view of the case. I, certainly, as before observed, do not claim, as belonging to the judiciary, the exercise of political power ; that belongs to another branch of the government. The protection and enforcement of many rights, secured by treaties, most certainly do not belong to the judiciary. It is only where the rights of persons or property are involved, and when such rights can be presented under some judicial form of proceedings, that courts of justice can interpose relief. This court can have no right to pronounce an abstract opinion upon the constitutionality of a state law. Such law must be brought into actual or threatened operation, upon rights properly falling under judicial cognisance, or a remedy is not to be had here.

The laws of Georgia, set out in the bill, if carried fully into operation, go the length of abrogating all the laws of the Cherokees, abolishing their government, and entirely subverting their national character. Although the whole of these laws may be in violation of the treaties made with this nation, it is probable, this court cannot grant relief to the full extent of the

complaint. Some of them, however, are so directly at variance with these treaties and the laws of the United States, touching the rights of property secured to them, that I can perceive no objection to the application of judicial relief. The state of Georgia certainly could not have intended these laws as declarations of hostility, or wish their execution of them to be viewed, in any manner whatever, as acts of war ; but merely as an assertion of what is claimed as a legal right : and in this light ought they to be considered by this court.

The act of the 2d of December 1830, is entitled " an act to authorize the governor to take possession of the gold and silver and other mines lying and being in that section of the chartered limits of Georgia, commonly called the Cherokee *country, and those upon all other unappropriated lands of the state, and for punishing persons who may be found trespassing on the mines." The preamble to this act asserts the title to these mines to belong to the state of Georgia ; and by its provisions, $20,000 are appropriated, and placed at the disposal of the governor, to enable him to take possession of those mines ; and it is made a crime, punishable by imprisonment in the penitentiary of Georgia, at hard labor, for the Cherokee Indians to work these mines. And the bill alleges, that under the laws of the state in relation to the mines, the governor has stationed at the mines an armed force, who are employed in restraining the complainants in their rights and liberties in regard to their own mines, and in enforcing the laws of Georgia upon them. These can be considered in no other light than as acts of trespass ; and may be treated as acts of the state, and not of the individuals employed as the agents. Whoever authorizes or commands an act to be done, may be considered a principal, and held responsible, if he can be made a party to a suit ; as the state of Georgia may undoubtedly be. It is not perceived, on what ground, the state can claim a right to the possession and use of these mines. The right of occupancy is secured to the Cherokees by treaty, and the state has not even a reversionary interest in the soil. It is true, that by the compact with Georgia of 1802, the United States have stipulated to extinguish, for the use of the state, the Indian title to the lands within her remaining limits, " as soon as it can be done, peaceably, and upon reasonable terms." But until this is done, the state can have no claim to the lands.

The very compact is a recognition by the state of a subsisting Indian right ; and which may never be extinguished. The United States have not stipulated to extinguish it, until it can be done " peaceably, and upon reasonable terms ;" and whatever complaints the state of Georgia may have against the United States for the non-fulfilment of this compact, it cannot affect the right of the Cherokees. They have not stipulated to part with that right ; and until they do, their right to the mines stands upon the same footing as the use and enjoyment of any other part of the territory.

Again, by the act of the 21st December 1830, surveyors *are authorized to be appointed to enter upon the Cherokee territory, and lay it off into districts and sections, which are to be distributed by lottery among the people of Georgia ; reserving to the Indians only the present occupancy of such improvements as the individuals of their nation may now be residing on, with the lots on which such improvements may stand, and even excepting from such reservation, improvements recently made near the

gold mines.   This is not only repugnant to the treaties with the Cherokees, but directly in violation of the act of congress of 1802 ; the fifth section of which makes it an offence, punishable with fine and imprisonment, to survey or attempt to survey or designate any of the boundaries, by marking trees or otherwise, of any land belonging to or secured by treaty to any Indian tribe ; in the face of which, the law of Georgia authorizes the entry upon, taking possession of, and surveying, and distributing by lottery, these lands guarantied by treaty to the Cherokee nation ; and even gives authority to the governor to call out the military force, to protect the surveyors in the discharge of the duty assigned them.

These instances are sufficient to show a direct and palpable infringment of the rights of property secured to the complainants by treaty, and in violation of the act of congress of 1802.   These treaties, and this law, are declared by the constitution to be the supreme law of the land ; it follows, as matter of course, that the laws of Georgia, so far as they are repugnant to them, must be void and inoperative.   And it remains only very briefly to inquire, whether the execution of them can be restrained by injunction according to the doctrine and practice of courts of equity.

According to the view which I have already taken of the case, I must consider the question of right as settled in favor of the complainants.   This right rests upon the laws of the United States, and treaties made with the Cherokee nation.   The construction of these laws and treaties are pure questions of law, and for the decision of the court.   There are no grounds therefore, upon which it can be necessary to send the cause for a trial at law of the right, before awarding an injunction ; and the simple question is whether such a case is made out by the bill, as to authorize the granting an injunction ?   *This is a prohibitory writ, to restrain a party from [*78 doing a wrong or injury to the rights of another.   It is a beneficial process, for the protection of rights ; and is favorably viewed by courts of chancery, as its object is to prevent rather than redress injuries ; and has latterly been more liberally awarded than formerly.   7 Ves. 307.   The bill contains charges of numerous trespasses, by entering upon the lands of the complainants, and doing acts greatly to their injury and prejudice, and to the disturbance of the quiet enjoyment of their land, and threatening a total destruction of all their rights.   And although it is not according to the course of chancery, to grant injunctions to prevent trespasses, when there is a clear and adequate remedy at law, yet it will be done, when the case is special and peculiar, and when no adequate remedy can be had at law and particularly, when the injury threatens irreparable ruin.   6 Ves. 147 ; Eden 207.   Every man is entitled to be protected in the possession and enjoyment of his property ; and the ordinary remedy by action of trespass may generally be sufficient to afford such protection.   But where, from the peculiar nature and circumstances of the case, this is not an adequate protection, it is a fit case to interpose the preventive process of injunction. This is the principle running through all the cases on this subject, and is founded upon the most wise and just considerations ; and this is peculiarly such a case.   The complaint is not of a mere private trespass, admitting of compensation in damages ; but of injuries which go to the total destruction of the whole right of the complainants ; the mischief threatened is great and irreparable.   7 Johns. Ch. 330.   It is one of the most beneficial

powers of a court of equity to interpose and prevent an injury, before any has actually been suffered ; and this is done by a bill, which is sometimes called a bill *quia timet.* Mitford 120.

The doctrine of this court in the case of *Osborn* v. *United States Bank,* 9 Wheat. 738, fully sustains the present application for an injunction. The bill in that case was filed to obtain an injunction against the auditor of the state of Ohio, to restrain him from executing a law of that state, which was alleged to be to the great injury of the bank, and to the destruction of rights conferred by their charter. The only *question of doubt entertained by the court in that case was, as to issuing an injunction against an officer of the state, to restrain him from doing an official act enjoined by statute—the state not being made a party. But even this was not deemed sufficient to deny the injunction ; the court considered, that the Ohio law was made for the avowed purpose of expelling the bank from the state, and depriving it of its chartered privileges, and they say, if the state could have been made a party defendant, it would scarcely be denied, that it would be a strong case for an injunction ; that the application was not to interpose the writ of injunction, to protect the bank from a common and casual trespass of an individual, but from a total destruction of its franchise, of its chartered privileges, so far as respected the state of Ohio. In that case, the state could not be made a party according to the 11th amendment of the constitution ; the complainants being mere individuals, and not a sovereign state. But according to my view of the present case, the state of Georgia is properly made a party defendant ; the complainants being a foreign state. The laws of the state of Georgia in this case go as fully to the total destruction of the complainants' rights, as did the law of Ohio to the destruction of the rights of the bank in that state ; and an injunction is as fit and proper in this case to prevent the injury, as it was in that.

It forms no objection to the issuing of the injunction in this case, that the lands in question do not lie within the jurisdiction of this court. The writ does not operate *in rem,* but *in personam.* If the party is within the jurisdiction of the court, it is all that is necessary, to give full effect and operation to the injunction ; and it is immaterial, where the subject-matter of the suit, which is only affected consequentially, is situated. This principle is fully recognised by this court, in the case of *Massie* v. *Watts,* 6 Cranch 157 ; where this general rule is laid down, that in a case of fraud, of trust, or of contract, the jurisdiction of a court of chancery is sustainable, wherever the person may be found, although lands not within the jurisdiction of the court may be affected by the decree. And reference is made to several cases in the English chancery recognising the same principle. In the case of *Penn* v. *Lord Baltimore,* 1 Ves. 444, a specific performance of a *contract respecting lands lying in North America was decreed ; the chancellor saying, the strict primary decree of a court of equity is *in personam,* and may be enforced in all cases when the person is within its jurisdiction.

Upon the whole, I am of opinion : 1. That the Cherokees compose a foreign state, within the sense and meaning of the constitution, and constitute a competent party to maintain a suit against the state of Georgia. 2. That the bill presents a case for judicial consideration, arising under the laws of the United States, and treaties made under their authority with the

Scott v. Ratliffe.

Cherokee nation, and which laws and treaties have been, and are threatened to be still further violated by the laws of the state of Georgia referred to in this opinion.   3. That an injunction is a fit and proper writ to be issued, to prevent the further execution of such laws, and ought, therefore, to be awarded.   And I am authorized by my brother STORY to say, that he concurs with me in this opinion.

Motion denied.

---

\*The Lessee of ROBERT G. SCOTT and SUSANNAH his wife, and     [\*81
   JAMES C. MADISON, Plaintiffs in error. *v.* SILAS RATLIFFE,
   THOMAS OWINGS, JOHN OWINGS and others, Defendants in error.

### *Hearsay evidence.—Land-law of Kentucky.*

A witness testified, that she resided in Petersburg, Virginia, and that Bishop Madison resided in Williamsburg, Virginia; that while she resided in Petersburg, she had seen Bishop Madison, but was acquainted with his daughter only by report; that she never had seen her nor Mr. Scott, but recollected to have heard of their marriage, in Petersburg, as she thought, before the death of her father; that she could not state from whom she heard the report, but that she had three cousins, who went to college, at the time that she lived in Petersburg, and had no doubt that she had heard them speak of the marriage; that she heard of the marriage, of Miss Madison, before her own marriage, as she thought, which was in 1810; that she was, as she believed, in 1811, in Williamsburg, and was told that Mr. Madison was dead: *Held*, that so much of this evidence as went to prove the death of Mr. Madison, was admissible on the trial, and ought not to have been excluded by the court.[1]

A patent was issued by the governor of Kentucky, for a tract of land containing 1850 acres, by survey, &c., describing the boundaries; the patent described the exterior lines of the whole tract, after which the following words were used, "including within the said bounds 522 acres entered for John Preston, 425 acres for William Garrard—both claims have been excluded in the calculation of the plat, with its appurtenances," &c.   Patents of this description are not unfrequent in Kentucky; they have always been held valid, so far as respected the land not excluded, but to pass no legal title to the land excluded from the grant.   The words manifest an intent to except the lands of Preston and Garrard from the patent; the government did not mean to convey to the patentee lands belonging to others, by a grant which recognises the title of these others.   If the court entertained any doubt on this subject, those doubts would be removed, by the construction which it is understood has been put on this patent by the courts of the state of Kentucky.[2]

The defendants claimed under a patent issued by the governor of Kentucky, on the 3d of January 1814, to John Grayham, and two deeds from him, one to Silas Ratliffe, one of the defendants, dated in August 1814, for 100 acres, the other to Thomas Owings, another defendant, for 400 acres, dated 25th March 1816; and gave evidence conducing to prove that they, and those under whom they claimed, had a continued possession, by actual settlement, more than seven years next before the bringing of this suit; the court instructed the jury, that if they believed from the evidence, that the defendants' possession had been for more than seven years before the bringing of the suit, that the act, commonly called the seven years' limitation act, of Kentucky, passed in 1809, was a bar to the plaintiffs' recovery; unless they found, that the daughter of the patentee, holding under a patent from the state of Virginia, was a *feme covert*, when her father, the patentee, died; or was so at the time the defendants acquired their titles by contract or deed from the patentee, John Grayham, the \*patentee     [\*82 under the governor of Kentucky; the words, " at the time the defendants acquired their title by contract or deed from the patentee, John Grayham," can apply to those defendants only who did so acquire their title.   The court cannot say, this instruction was erroneous.

ERROR to the Circuit Court of Kentucky.   On the 2d of April 1825, the plaintiffs commenced an action of ejectment against the defendants, assert-

---

. [1] Secrist *v.* Green, 3 Wall. 744.          [2] Armstrong *v.* Morrell, 14 Wall. 120.